(No. 6310. April 29, 1936.)

MARY PARKISON, Appellant, v. ANACONDA COPPER MINING COMPANY and STATE INSURANCE FUND, Respondents.

[57 Pac. (2d) 1216.]

Anderson, Bowen & Anderson, for Appellant.

B. W. Davis and P. C. O'Malley, for Respondents.

MORGAN, J.—May 13, 1932, William T. Parkison, employed by Anaconda Copper Mining Company, hereinafter called the company, as a chemist at its mine at Conda, made an analysis of a sample of ore from the mine. In doing so he placed the ore in sulphuric acid and applied heat to it by means of an electric plate, under a hood connected with a ventilator, in his employer's laboratory. While the sample was heating he went into a room adjoining the laboratory

where he remained about fifteen minutes talking to his assistant. He then opened the door into the laboratory room, which had filled with sulphuric acid gas. Immediately after Parkison entered the room his assistant saw him coming out on his hands and knees, coughing violently. The assistant helped him to his feet and into the open air. This occurred between three and four o'clock in the afternoon. Parkison did not appear to have suffered any serious injury from the gas and went home about four o'clock. He worked at his regular employment during a part of May 14, and the record is not clear as to whether he quit during the day because he was not feeling well or whether he had finished the performance of his duties. The work at which he was employed was discontinued on that day and he did no more work for the company thereafter. June 21, 1933, Parkison died, and his widow, appellant herein, filed a claim with the industrial accident board against the company and State Insurance Fund, its surety, for an award of compensation provided for by I. C. A. 43–1101, a section of the workmen's compensation law. Hearing was had and resulted in an order by the board denying compensation. Appeal to the district court resulted in judgment affirming the order and the case is here on appeal from the judgment.

In September, 1930, Parkison, while employed by the company, in its laboratory, was severely injured by an explosion of nitric-hydrochloric acid. He made claim for compensation which was allowed and was settled by agreement between the parties. The agreement was approved by the industrial accident board and compensation for that injury is not involved in this case.

The only material conflict in the evidence consists of difference of opinion of expert witnesses as to whether Parkison's contact with sulphuric acid gas on May 13, 1932, caused his death. Each party litigant produced two physicians as witnesses. One of those called on behalf of appellant testified he treated Parkison for his injury of 1930, but did not treat him for that of May 13, 1932; that he commenced treating him again in March, 1933, and his condition was such as a man would be suffering from who had inhaled quantities

of sulphuric acid gas; that he saw the patient, from time to time, until he died. He further testified:

"Q. From your experience as a physician and surgeon and your number of years practice, as you have stated, what is your opinion as to whether this man died from the effects of breathing sulphuric acid fumes into his lungs or not?

"A. It could be all right."

On cross-examination:

"Q. Doctor, do you mean to say that you know, that you want to state as a physician and surgeon that it is your opinion that this man died because he had inhaled some gas on May 13, 1932?

"A. Not necessarily. I know he died from the condition of his lungs, and if he had an injury in 1932 it would aggravate it and probably could cause it.

"Q. Could cause it?

"A. Yes.

"Q. That is about as close as you could say, doctor?

"A. That is all I could say."

Evidence of that character is insufficient to prove death was due to the accidental injury relied on by appellant as a basis of claim for compensation. (*Larson v. Ohio Match Co.,* 49 Ida. 511, 289 Pac. 992.)

June 3, 1932, Parkison filed claim for compensation for his injury alleged to have been incurred by contact with gas on May 13, of that year. In his claim he stated the injury consisted of "corrosion of membranes in nose and throat." Upon that claim he was paid compensation for disability during a period of ten weeks and three days. The other doctor called as a witness by appellant made the attending physician's report in support of Parkison's claim. Therein the following questions and answers appear:

"1. Date of injury? 5/13/32. Date of first treatment? Same.

"3. Give an accurate description of the nature and extent of the injury? Acid burn of the lungs and upper air passages also of the face.

"8. Describe the treatment fully? Rest, morph. for pain, inhalations of medicated vapors."

That physician testified on direct examination:

"A. If I recall rightly, I took care of Mr. Parkison for the second accident, but I saw him in consultation with Dr. Tigert,` and he called at the office several times, but I don't believe I took care of Mr. Parkison in the first accident. . . . .

"Q. Did you make any examination immediately after May 13, 1932, immediately after this second accident?

"A. Yes, he was under my care.

"Q. Now, with respect to this first examination that you made after that second accident, what did you find there with reference to his lungs, if anything?

"A. He scarcely had any lung tissues left, practically none. Right from the start he seemingly didn't use his lungs to breathe. He used the accessory muscles, these here (point-, ing). Instead of expanding his chest outwards like this (illustrating) he did this way (illustrating). He would use his shoulder, the accessory muscles, in breathing.

"Q. Did you notice any change in reference to that method of breathing from the first time you saw him or not?

"A. Oh, yes, he never breathed that way before. He breathed practically natural before."

He testified on cross-examination:

"Q. And you attributed his death a year and a month or a little over after the 13th of May, 1932, directly to the breathing of sulphuric acid on May 13, 1932?

"A. I do.

"Q. You don't attribute it to the first accident at all?

"A. I think the first accident lowered this man's vitality, lowered his lung capacity more than half, but he was getting along on a half a lung pretty well and probably could have lived quite a while on half a lung. A great many people in the world are living on probably less than half a lung, but now a man that is living on a half a lung or small amount of lung tissue is not able to go out and do physical hard work."

May 21, 1931, almost a year before Parkison encountered the sulphuric acid gas, this witness wrote a letter, with reference to his condition, to the manager of state insurance fund, in which he said:

"You know that man is slipping and slipping pretty fast. I was just wondering for the interest of the state if it would

not be a pretty good idea for you to get a settlement with him on a 50% disability, or else you may have to pay a death claim.''

This witness operated on Parkison's nose August 16, 1932, and testified as to what made the operation necessary, as follows:

''Q. Well, did this second accident have anything to do with his trouble with his nose?

''A. Yes, it would add to it.

''Q. Well, what was the cause of that?

''A. Cause of the trouble?

''Q. Yes.

''A. Well, it added to, and no man can breathe sulphuric acid without irritating his nose and air passages, and the first time, of course, he sustained this injury, and the second time,—of course, there was a certain amount of damage done the first time and there would probably be just as much done the second time.

''Q. It would not have been necessary to operate on his nose if he had not have had this second accident?

''A. Was it in '32 that I operated on him there?

''Q. You did operate on his nose in '32 after the second accident.

''A. Yes, I probably do remember about taking out some dead bone.

''Q. You understand my question?

''A. Sir?

''Q. What I am getting at is, would you say you would have had to operate on him in '32 for his nose whether he had this accident in May or not?

''A. No, I don't think so.''

The doctor's further testimony on this point shows he was uncertain as to whether the operation would have been necessary had Parkison not encountered the sulphuric acid gas. He wrote a letter to the state insurance fund, dated September 27, 1932, wherein he said:

''Relative to the William Parkison case, am very sure that the result of his condition necessitating an operation on the nose, Aug. 16, 1932, was not the result of the injury he received May 13th of this year, there was too much destruction of bone tissue to come from such a recent injury, however the

last injury might have aggravated it some very little but not enough to be taken into consideration.''

As to the severity of the injury resulting from gas on May 13, 1932, he testified:

''Q. How long did you see him after he was burned the second time, how many days?

''A. I think I saw him right away. I believe they brought him in,—if I recall rightly, he was taken to the hospital then.

''Q. That day, you think?

''A. Yes, I think it was. It is a long time for me to recall, but you certainly have the records here.

''Q. Now, just what was his condition from that burn? How badly was he burned?

''MR. PETERSON: Only at the time we are talking about, May 13th.

''A. When I saw him the man could scarcely get his breath at all. It was almost impossible. His fingers were cyanosed, and he was blue all over, and breathing in such a way it looked like impending death right then.''

The hospital records fail to show Parkison was admitted or treated there, August 13, 1932, or thereafter prior to August 16, of that year. A comparison of this testimony with that of Parkison's assistant, who was with him when he encountered the gas on May 13, 1932, and that of the manager of the company, who saw Parkison and talked to him just before he went home that afternoon, raises a doubt as to whether the doctor and these witnesses were testifying about the results of the same accident. Parkison's assistant testified:

''Q. What time did Mr. Parkison go home the day of the 13th of May?

''A. I think it was around four o'clock, I believe.

''Q. Yes. That was after the gas had cleared up?

''A. Yes.

''Q. Did you and Mr. Parkison go back into the room then?

''A. After that cleared out, yes.

''Q. And what was done with these samples that were on the plate?

''A. Mr. Parkison took them off and turned off the heat, the heat on the hot plate.

"Q. What was his condition? Was he able to walk and get around?

"A. He was at that time, yes.

"Q. Did you notice anything the matter with him then?

"A. Well, he had more or less recovered from the bad dose of gas he had received a few minutes before, but he was still —well, I don't know—he showed effects of it, I thought.

"Q. Yes. You thought. Was he able to walk and talk properly?

"A. Yes.

"Q. You didn't have to assist him?

"A. No."

The manager testified:

"Q. I will ask this question: You talked to Mr. Parkison about four P. M. on the 13th?

"A. Yes.

"Q. And he told you at that time that they had had some trouble with the gas or fumes and had had trouble in getting the windows open?

"A. He told me that.

"Q. Yes. Now, how long before your conversation with him had it been that they had trouble with the gas?

"A. I don't know that exactly, but I understood that it had occurred shortly before I came in, perhaps half an hour and perhaps three-quarters of an hour. I am not positive of the time.

"Q. But who did you understand that from as to how long before it had happened?

"A. Mr. Parkison. . . . .

"Q. Now, what was his physical condition when he was talking to you?

"A. He appeared to be normal.

"Q. Did he come to work the next day?

"A. Yes."

In order to determine Parkison's physical condition, after his accident in September, 1930, two physicians, in June, 1931, made thorough examinations of him and testified, in detail, as to their findings. Each testified it was his opinion, based on his examination and on the facts shown by the testimony of other witnesses, that Parkison's death did not result from inhaling sulphuric acid gas, but was due to other causes.

■■ The burden was on appellant to show, by preponderance of evidence, that her husband's death resulted from accident arising out of and in the course of his employment, to wit, the inhalation of sulphuric acid gas on May 13, 1932. (I. C. A., secs. 43-1001 and 43-1101; *Hawkins v. Bonner County*, 46 Ida. 739, 271 Pac. 327; *Webb v. Gem State Oil Co., ante,* p. 465, 55 Pac. (2d) 1302, and cases therein cited.) The evidence fails to show death resulted from that cause, but the preponderance thereof sustains the contention that it was due to other causes.

The judgment appealed from is affirmed, with costs to respondents.

Givens, C. J., and Ailshie, J., concur.

Budge, J., dissents.

Holden, J., deeming himself to be disqualified, did not sit with the court at the hearing nor participate in the opinion.

### ON PETITION FOR REHEARING.

(May 29, 1936.)

AILSHIE, J.—Appellant has filed a petition for rehearing in this case which we have given careful consideration. The contention made for a rehearing is embodied in the following statement in the petition:

"This petition for a rehearing is based upon a consideration of the following matter, which it seems was not given due consideration by the court in its original opinion.

"All of the evidence opposing plaintiff-appellant's claim for compensation was based upon the statements of the witnesses and Doctors Newton and Roberts as to the cause of death, which evidence of said doctors was in turn predicated upon an examination made of Wm. T. Parkison before he was injured on May 13, 1932. Evidence based upon such physical examination before the injury was received, for which compensation is claimed and which it is contended by claimant and appellant caused Parkison's death, is so conjectural

and speculative as to not have any force and effect whatever and not entitled to any weight and consideration. If this is true, then it must follow that the evidence of the doctors who testified for the plaintiff stands here unopposed and undenied."

If the contention made in the petition is true, that the "evidence of said doctors Newton and Roberts was in turn predicated upon an examination made of Wm. T. Parkison before he was injured on May 13, 1932," there would be merit in the contention made by the petitioner that such evidence "is so conjectural and speculative as to not have any force and effect."

The record before us, however, does not support the contention made by the petitioner. On the contrary it appears that both Doctors Newton and Roberts were present in the courtroom and heard the testimony of Parkison's wife and of the two doctors who testified on behalf of the claimant; and that they each predicated their answers upon the conditions they found when they examined Parkison in 1931 and upon *the testimony and history of the case as given in court by claimant and the two physicians who had testified in support of the claim.*

The following question was asked of Dr. Newton:

"Q. Doctor, from your examination of the man and the testimony that has been given here with reference to his death, what, in your opinion, caused his death, was the immediate cause of his death?"

It appears throughout his testimony that Dr. Newton's answers were predicated upon the entire history of the case, both as learned by the witness from examination made in 1931 and the testimony given by the witnesses as to his subsequent condition up to the time of his death.

The record also discloses substantially the same situation with reference to the testimony of Dr. Roberts who was asked this question:

"Q. Taking into consideration the history as given here in the case and all of the testimony, what would you say as to whether or not this man's death could have been caused as a result of being gassed on May 13, 1932?"

For the foregoing reasons the petition must be denied, and it is so ordered.

Givens, C. J., and Morgan, J., concur.

Budge, J., dissents.

Holden, J., deeming himself disqualified, did not sit at the hearing nor participate in the opinion.