(No. 6279.   March 12, 1936.)

VIRGINIA WEBB, Guardian of the Person and Estate of R. A. WEBB, an Insane Person, Respondent, v. GEM STATE OIL COMPANY and AMERICAN EM-PLOYERS' INSURANCE COMPANY, a Corporation, Appellants.

[55 Pac. (2d) 1302.]

Elam & Burke, for Appellants.

George Donart and Herman Welker, for Respondent.

MORGAN, J.—R. A. Webb was employed by Gem State Oil Company as its representative in sole charge of its warehouse and wholesale gasoline and oil business at Weiser. During a few days prior to his employment he twice agreed to accept it and, changing his mind without apparent cause, decided not to do so. September 13, 1933, he again agreed to accept the employment and, on that occasion, took charge of the warehouse and undertook the discharge of his duties. The next day he notified an official of the oil company, by telephone from Weiser to Twin Falls, that he was unable to

discharge the duties of the employment and asked to be relieved therefrom.

It was arranged that someone would be sent, on September 16, to take over the business and J. A. Ricks, a representative of the company, produced by respondent as a witness, testified that he arrived in Weiser about four o'clock in the afternoon of that day, and went to the warehouse to make an inventory of the stock and place another man in charge. The warehouse was surrounded by a wire fence and he found the gates shut, the truck, used in conducting the business, in the garage and the doors of the warehouse closed. Hearing calls for help, he went into the warehouse where he found Webb lying on the floor, on his back, with a full drum of oil, weighing about 550 pounds, lying across his legs at about the knees.

Webb had an abrasion on his nose and another on his right elbow, neither of which was serious. He had a serious bruise on the right side of his chest and, several weeks after the event above mentioned, an X-ray picture showed a number of his ribs on that side had been fractured.

Ricks rolled the drum off Webb's legs and helped him to a chair in the office. Webb, in explanation of what had happened, told Ricks he was lifting the drum and slipped in a pool of oil on the floor and fell. There is a bench about two feet high in the building on which drums are placed for the purpose of drawing oil through spigots. There was no spigot in the drum found on Webb's legs, and it contained oil for which, at that time of year, there was no demand.

The drums containing oil are barrel-shaped, constructed of steel, and the sides extend beyond the heads about two inches at each end. A chain hoist was used to lift the drums onto the bench. It was stationary and was so attached to the building, directly above one end of the bench, that when a drum was lifted it would swing onto the bench. The hoist, when loaded, would not slip, but in order to raise or lower the drum it was necessary to pull the chain one way or the other as required. The hoist was equipped with crampons by means of which it could be attached to a drum.

Ricks was asked:

"Q. Did he have the chain in contact with the drum at that time, the end of the chain?

"A. I am not positive whether he did or not, but I do know, I think, that he did have it under the drum, and he told me he had tried to lift the drum off with the chain, but I am not sure.

"MR. SUPPIGER: Off himself?

"A. Off himself, yes."

When found Webb was lying about three feet from the end of the bench. He was taken to his home and a doctor was called, who treated him until October 25, 1933, when he had recovered from his bodily injuries.

October 28, 1933, Webb became violently insane and thereafter his wife, respondent herein, was appointed guardian of his person and estate. She made claim against appellants, his employer and its surety, for compensation provided for by the Workmen's Compensation Law. After hearing had, the industrial accident board made findings of fact and rulings of law, and entered an order denying compensation. The fourth and fifth findings are as follows:

IV.

"From the oral and documentary evidence submitted and from the view of the premises by the Board the Board specifically find that it was physically impossible for the drum of oil which on the 16th day of September, 1933, was on and across the legs of the said R. A. Webb to get on or to have gotten on or across his legs by accident and specifically find that the said drum did not get on and across the legs of the said R. A. Webb or against his body by accident and specifically find that none of the injuries to the body of the said R. A. Webb received on said September 16, 1933, were the result of any accident arising out of and in the course of the employment of the said R. A. Webb with the said defendant, Gem State Oil Company."

V.

"That for several years prior to September 16, 1933 said R. A. Webb suffered from nervousness; that he was of a very sensitive nature and had to be treated by his employer with great care on account of his sensitiveness and nervousness; that he was very nervous after taking over the work with the Gem State Oil Company and was not able to sleep nights; that he had great difficulty in arriving at a conclusion and vacillated greatly after arriving at a conclusion; that

by training said R. A. Webb was well equipped to handle said work; that the duties of said work were simple in their nature and the work was very light being not much in excess of half-time work; that the mind of said R. A. Webb was so badly disorganized that he could not handle said work—even the simplest duties thereof—in a logical reasonable manner; that he asked about compensation immediately after said J. A. Ricks had helped him up from the floor; that within a few days after September 16, 1933 he began to ask about compensation and began to voice the opinion that the Gem State Oil Company was antagonistic to him; that he imagined that different parts of his body were not functioning properly; that he had fully recovered from his physical injuries by October 25, 1933; that he became violently insane on October 28, 1933 and was committed to the insane asylum at Blackfoot; that he was later transferred to the United States Veterans Hospital at American Lake near Tacoma, Washington, a mental hospital; that he suffers from Dementia Praecox, Catatonic form; that his mental condition has been of a progressive nature over a period of years and has now reached a stage where he is totally and permanently disabled by reason of his said mental condition; that the injuries received by said R. A. Webb on September 16, 1933 did not cause his mental condition and did not contribute, did not accelerate and did not aggravate his mental condition and did not cause or have anything to do with aggravating or accelerating his insanity."

From an order denying compensation respondent herein appealed to the district court, which, upon consideration of the testimony taken by the board, made findings of fact to the effect that Webb suffered injury by accident arising out of and in the course of his employment and that his injury "is the cause of his mental condition which caused his insanity." Judgment was entered remanding the cause to the board and directing it to allow compensation. This appeal is from the judgment.

These questions are presented: 1. Did Webb suffer an injury by accident arising out of and in the course of his employment, and, if he did: 2. Was his insanity caused, or accelerated or aggravated, by his injury?

The burden was on claimant, respondent herein, to show that Webb suffered an injury by accident arising out of and in the course of his employment. (I. C. A., sec. 43–1001; *Walker v. Hyde,* 43 Ida. 625, 253 Pac. 1104; *Croy v. McFarland-Brown Lbr. Co.,* 51 Ida. 32, 1 Pac. (2d) 189; *Dunnigan v. Shields,* 52 Ida. 195, 12 Pac. (2d) 773; *Vaughn v. Robertson & Thomas,* 54 Ida. 138, 29 Pac. (2d) 756; *Liberg v. Genessee Union Warehouse Co.,* 55 Ida. 123, 38 Pac. (2d) 999.) The evidence on this point is not in dispute, but from it the board and the district judge have reached different conclusions.

Webb was an employee of the oil company and was at the place of his employment, during the hours thereof, when that occurred which is relied on as an accident. It is true it is difficult to picture in the imagination how the drum got on his legs by accident, but we are not prepared to sustain the board in finding it was impossible. The facts that the drum was on Webb's legs and that the right side of his chest was seriously bruised are established and the evidence suggests no other theory than that the injury was caused by the drum falling on him. Difficulty is encountered in deciding whether the drum fell on Webb's body as the result of an accident, or whether he caused it to do so intentionally. His statement to Ricks of what happened is unsatisfactory and lacking in many important particulars, and it is to be regretted that the representative of the company did not question him in detail about it when he found him.

It is true, as pointed out by the board, Webb's mind, prior to his injury, was in an abnormal, unsettled condition, but he does not appear to have been so far bereft of reason as to justify a conclusion that he purposely caused the drum to fall on him. He had never shown any suicidal tendencies nor any disposition to injure himself. Before employing him the oil company made a thorough investigation of his qualifications and satisfied itself he was competent and, in all particulars, suitable to have charge of its business in Weiser. His reputation in the community wherein he had for a long time resided would not justify the thought that he was attempting to perpetrate a fraud on his employer or its surety and, if this were not so, industrial accident insurance is in-

sufficient to fully compensate for loss of time, and less sufficient to compensate for physical suffering.

■ When the hearing was had before the board Webb was insane and his testimony was not available. This situation makes applicable the rule often applied where the lips of a witness have been sealed by death. It is thus stated in *Chiara v. Stewart Min. Co.*, 24 Ida. 473, 478, 135 Pac. 245:

''The presumption must be indulged, in the absence of proof to the contrary, that one who was killed while engaged at his duties was exercising reasonable care and precaution for the protection and preservation of his person and life, and that he was possessed of the ordinary instincts for self-preservation.''

See, also, *Staab v. Rocky Mountain Bell Tel. Co.*, 23 Ida. 314, 129 Pac. 1078.

The instincts of self-preservation which prompt a man to avoid negligently exposing himself to danger, prompt him, with equal or greater force, to refrain from injuring himself by design, and, in this case, raises a disputable presumption that Webb's injury was accidentally and not purposely inflicted.

■ While, as heretofore pointed out, the burden was on respondent to show Webb's injury was caused by accident arising out of and in the course of his employment, it was not necessary for her to prove it by more than preponderance of evidence. The presumption that he did not hurt himself purposely is to be considered in deciding on which side the evidence preponderates. In *Leach v. Grangeville Highway District*, 55 Ida. 307, 41 Pac. (2d) 618, we said:

''In a case of this kind the decision is to be made according to preponderance of evidence, and it is not incumbent on a claimant to establish the cause of his injury by proof of a higher degree than that, or to the exclusion of other possible causes. *Roe v. Boise Groc. Co.*, 53 Ida. 82, 21 Pac. (2d) 910; *Riley v. City of Boise*, 54 Ida. 335, 31 Pac. (2d) 968.''

See, also, *Watkins v. Federal Life Ins. Co.*, 54 Ida. 174, 29 Pac. (2d) 1007.

■ That part of the decision of the district judge wherein he held Webb suffered an injury by accident arising out of and in the course of his employment is approved.

■ ■ Answer to the question as to whether Webb's insanity was caused, or accelerated or aggravated, by his injury is dependent on the testimony of expert witnesses.

The findings of the board and those of the judge do not agree as to the cause of Webb's insanity. The board found it was neither caused, contributed to, accelerated nor aggravated by his injury. The judge found to the contrary. The finding of the board is supported by the testimony of Dr. A. C. Stewart and Dr. James L. Stewart, and the testimony of Dr. Robert M. Coats supports the finding of the judge. The doctors all agreed Webb was suffering from dementia praecox, catatonic form. The only conflict in their testimony is on the question as to whether this form of insanity can be produced, accelerated or aggravated by traumatic injury. Dr. Coats testified, with respect to his special qualifications in mental cases, as follows:

"Q. And what has been your special training on mental diseases or diseases of that kind?

"A. I have had one special course at the Chicago, or Cook County Psychopathic Hospital under Dr. Nayman.

"Q. What was the nature of that?

"A. Examining and treating of all forms of nervous and mental diseases.

"Q. And any particular form of insanity?

"A. Well, all forms came into the hospital.

"Q. How long were you so engaged?

"A. About three months."

He further testified he had been engaged in the practice of medicine and surgery since 1929 and, with respect to the cause of Webb's insanity, gave his opinion as follows:

"Q. Now, Doctor, what would you say as to whether or not the injury that he sustained was the cause of his insanity?

"A. I would say that the probable cause of his insanity (there is no question in my mind about it) is the injury that occurred.

"Q. And would you say that there would be no question in your mind as to whether or not that injury at least accelerated it?

"A. It was certainly the exciting cause of it."

Dr. A. C. Stewart testified that since 1910 he has devoted his practice entirely to nervous and mental diseases; that

since 1926 he has been in private practice in Tacoma, Washington, and during that time has been medical superintendent of the Puget Sound Sanitarium, an institution for the cure of nervous and mental diseases; that in the afternoons he has a consulting practice and is consultant for the Northern Pacific Hospital, the Union Hospital in Tacoma, and the Tacoma General Hospital in nervous and mental cases. With respect to his experience he further testified:

''In 1910 I entered the state service of the state of Washington and continued that until 1917, when I entered the Army, and I was at state service in the state hospital for mental diseases, I was in the northern state hospital and the western state hospital, and then during the War I was assigned to this duty as caring for mental and nervous cases. I held the position as chief of that service at Fort Lewis, an overseas unit, and continued in that until the end of the War in the summer of 1919. Following that I entered the United States Public Health Service as surgeon and was assigned to duty in Seattle as chief of the neuropsychiatric service of the Veterans' Bureau, 13th District, which included Oregon, Washington, Idaho and Alaska, and continued in that until 1926, when I was appointed as clinical director of the Government Hospital at American Lake, and then I resigned in 1926 to enter private practice.''

He further testified:

''Q. With reference to the connection of trauma, or the possibility of trauma affecting dementia praecox—

''A. As I said before, there is no known cause for dementia praecox, that it is supposed to be a psychogenetic condition; that we find out that in these cases, in the history of these cases we find that practically throughout their life there has been a difficulty in them adjusting themselves to any environment, that they are usually sensitive, often easily hurt, easily annoyed. They may be extremely irritable. They are most likely to be a sort of introvert types.

''MR. SUPPIGER: He asked you about the connection with trauma in regard to this matter.

''A. I am probably taking too round about way to answer it. I will limit it more there. I don't believe that trauma is a factor in producing dementia praecox, I do not know of any such cause.''

He testified that in his opinion the accident had no connection with or effect whatever on Webb's mental condition, and in explanation of his testimony said:

"I would say that trauma isn't,—traumatic, traumatism or injury isn't considered as a great factor in producing any mental disease. That is contrary to popular belief. Statistics bear that out very definitely. Of the 70,000, there is about 70,000 mental cases a year admitted to institutions in the United States and during that time one-third of one per cent. of these has been shown to be due to injury, and that means a very definite injury to the central nervous system.

"Q. What do you mean by the central nervous system?

"A. Brain and spinal cord."

Dr. James L. Stewart, of Boise, a physician and surgeon of many years' experience, agreed with Dr. A. C. Stewart in his analysis of the case and the conclusion he arrived at. He testified he did not believe the injury which Webb received had anything to do with his mental condition which thereafter developed.

It is true, as pointed out by counsel for respondent, that Dr. A. C. Stewart never saw Webb until he became violently insane and had been placed in the institution at American Lake, Washington, and that Dr. James L. Stewart never saw him at all. Also that Dr. Coats knew him before the accident and treated him after it occurred until he was adjudged insane and removed from Weiser. Counsel insists Dr. Coats had a better opportunity to form an opinion with respect to the mental condition of his patient than did either of the other expert witnesses. This is true, but is not decisive of the question before us,—which is: Can dementia praecox, catatonic form, agreed by all the experts to be the type of insanity with which Webb was afflicted, be produced, aggravated or accelerated by trauma? A correct answer to that question is in no way dependent on acquaintance with the case under consideration. It is dependent on the education of the witness and the opportunities he has had of observing and studying that class of cases.

All the testimony in this case was produced at the hearing before the industrial accident board, and the depositions of the witnesses were presented to the trial judge. Since these depositions are before us we are in as good position as he was

to find the facts established by them, and it is our duty to examine the evidence and determine its value. (*Cannon v. Seyboldt*, 55 Ida. 796, 48 Pac. (2d) 406, and cases therein cited on this point.)

It is shown by preponderance of the evidence that Webb's injury neither caused, accelerated nor aggravated his insanity. The judgment appealed from is modified and the cause is remanded to the district court, with direction to remand it to the industrial accident board, and that the board enter an award in conformity to the views herein expressed. No costs allowed.

Givens, C. J., and Holden and Ailshie, JJ., concur.

Budge, J., did not sit at the hearing and took no part in the decision of this case.