(No. 6448.   July 16, 1937.)

ELIZABETH SUREN, Respondent, v. SUNSHINE MIN-
ING COMPANY, Appellant.

[70 Pac. (2d) 399.]

J. E. Gyde and James E. Gyde, Jr., for Appellant.

Robert E. Brown and James A. Wayne, for Respondent.

MORGAN, C. J. — Prior to and on September 3, 1935, Frank Suren, husband of respondent, was employed by appellant as a laborer in its mine in Shoshone County. On that day he and three other employees of appellant were engaged in putting a mining timber, fourteen feet long and about twelve inches in diameter, in place. The stope where the men were working had not been completely floored and the timber was lying on the floor in such a position that, in helping, or preparing to help, to move it, Suren's foot slipped from the floor into a hole or depression and he fell across the timber, striking it with his chin and the left side of his chest. Apparently he did not consider the accident serious at the time and resumed his work immediately, or shortly, after it occurred. He continued to work during the remainder of the shift, but on his arrival at his home he told of the injury and complained of a pain in his side. His wife, respondent herein, was temporarily away from home at the time of the accident and her mother, Mrs. Oldham, who resided with Suren and his wife, had charge of the household during respondent's absence. She testified, by deposition, that when Suren reached home she had his dinner ready; that he sat down at the table holding his side and said, "I don't believe I want to eat anything; I don't feel like eating"; that his side seemed to be troubling him quite a lot; that he did not eat his dinner but drank lemonade; that he made a pitcher of lemonade and drank it and lay down; that

he complained of his side all the time; that he complained of a pain in the region of the heart under the left breast ''just under the breast and along between the long ribs and the short ribs, he complained so much; just at the lower lobe of the lung.'' Her testimony further shows Suren did not go to work the next day (September 4) but stayed in bed most of that day and all night; that during the day ''he just laid around home like any man would that wasn't feeling good; he didn't go any place''; that he was complaining and taking cold drinks all day. ''He would take lemonade and orange juice; that was all he did take that day. He didn't eat''; that he went to work the following day (September 5) and returned home at the usual quitting time; that after returning home ''he didn't do anything. He just sat around and laid down for a while and got up a while. He took a little walk out and come back and went to bed early; he didn't go to bed so early, but Sid Barker and I was here with him, but he went to bed about eleven o'clock, see; that is, he set by the table just leaning on the table drinking lemonade all the time. He didn't lie down and he felt too bad to sit up, but he would lean on the table, leaning over to one side''; that September 6th he was in bed most all day. ''He would just get up and set on the lounge and lie down here and then went to bed again for a while. He seemed to be just kind of resting, and he still continued to drink his lemonade and orange juice but he didn't eat anything. Why, I did make a mistake. He sent to town and got beefsteak and he chewed some of it and kind of sucked the juice out of it but he didn't eat any of it or try to.'' She further testified that he did not return to work on Friday; that on Saturday, September 7th, he asked her to call Dr. Lindsay, which she did.

Dr. Lindsay testified to having made an examination of Suren; that he had a temperature of approximately 103; that he examined him with a stethoscope and found ''on the left side, low down in the region of the nipple line and back from that, a defined area of consolidation, beginning consolidation. The sounds were dull, not normal lung sounds at all. He was breathing very rapidly and to me seemed to be a very sick man at the time''; that ''there was an abrasion of the skin

over this area and also a slight laceration on the left side of his chin''; that Suren said he had fallen while at work.

"Q. Did he indicate where he had been injured?

"A. He said he was struck on this same side. . . . .

"Q. That was the left side?

"A. Yes."

The doctor further testified he diagnosed the condition of the lung as lobar pneumonia. He further testified:

"Q. From his condition at that time could you form or did you form any opinion as to how long he had been suffering from pneumonia?

"A. In a consolidation of the lung, probably two days and a half or three days I would think he had probably had temperature and beginning symptoms. . . . .

"Q. From your examination of Mr. Suren, did you form any opinion as to what was the cause of the pneumonia?

"A. I felt that his injury was at least a contributing cause to his pneumonia. How much, it would be impossible to state, as far as I could see."

On cross-examination, Dr. Lindsay testified:

"Q. How much of a blow would it take against a man's side to cause an injury to the lung?

"A. I don't know.

"Q. Would it be little or great?

"A. A very slight blow over the lung might cause an irritation of the pleura and injure the lung itself.

"Q. In your opinion would a slight blow cause such irritation?

"A. It could.

"Q. Can you explain to the Board a little more fully what you mean by a light blow, so the Board can have some idea how much of a blow it would take to cause an injury to the lung?

"A. It might not be a blow even. It might be squeezed or pressed enough to cause irritation there. Anything that would irritate the side deep into the chest cavity and around the pleura.

"Q. Would it likely do so?

"A. Not likely.

"Q. Could you squeeze a lung in its cavity without fracturing a rib, sufficient to hurt the lung?

"A. Yes. . . . .

"Q. Isn't it given by the authorities that it takes a very severe blow to cause lobar pneumonia?

"A. Not necessarily.

"Q. Does it take a severe blow to injure the lung?

"A. Probably a light blow—that is a question as to what is a light blow and a hard one. I am inclined to believe that a blow or squeeze sufficient to produce the symptoms he early complained of, would be sufficient to injure his lung and make it easier for pneumonia to occur."

He further testified that taking all the history and the examination into consideration he would say Suren's pneumonia was caused by his injury; also that "The exciting cause of his pneumonia was his injury, the exciting factor which lowered his resistance of his lungs at that particular spot." The doctor advised Suren to go, at once, to the Wallace hospital where, by reason of his employment, he was entitled to free treatment and hospitalization, which he did.

Dr. John T. Wood, who did not see Suren during his last illness, and whose information was derived from hearing the testimony of other witnesses and from a hypothetical question which recited the history of the case, testified: "If I had been in attendance on that case I should conclude that the injury was quite an important contributing cause of the pneumonia." On cross-examination, Dr. Wood testified:

"Q. What kind of an injury would it be necessary for there to be, for it to be a contributing cause, a severe or slight injury?

"A. I should have to be guided in answering that question by my reading. I had no actual experience myself with any traumatic pneumonia due to a chest injury. I have had no experience in my own practice due to a chest injury alone. In 32 years I have never seen a case of that kind. I have seen them with general injuries where the person was more or less smashed up from an automobile wreck and coupled with exposure and cold but I have had no experience with just a chest injury alone and I would have to be guided by my read-

ing. I understand from reading that comparatively trivial injuries to the chest may be and are the contributing causes of the development of lobar pneumonia.''

Dr. Max T. Smith, a physician and surgeon who, together with Dr. Ellis, conducts a hospital in Wallace which has the contract to furnish medical and surgical treatment and hospitalization for employees of Sunshine Mining Company, was called by appellant as a witness in its behalf and testified to having seen and examined Suren after he was brought to the hospital September 7th; that he did not notice any evidence of injury or abrasion on the patient's chest and thought he would have remembered it had there been any; furthermore, that he noticed in his notes they used a mustard plaster which they would not have used had there been any trouble with the skin. On cross-examination, he testified:

''Q. You heard Dr. Lindsay testify that at five o'clock that afternoon he found this abrasion pretty well scabbed over. You found no evidence of that?

''A. I can't recall it.

''Q. You wouldn't say it was not there, would you?

''A. Not if Dr. Lindsay says it was. I didn't see it.''

Dr. Smith further testified, on direct examination:

''Q. Basing your opinion on the testimony you have heard at this hearing what is it as to whether the deceased's lobar pneumonia was due to an injury and that the lobar pneumonia was the cause of his death?

''A. There is no question but that lobar pneumonia was the cause of his death. You mean from my examination?

''Q. Yes.

''A. I had no suspicion even, and no history and no idea that there was any injury in this case until after the man was dead.

''Q. In your opinion could an injury as has been testified to here have been the inciting cause of that lobar pneumonia?

''A. From the literature I have read, I would say it possibly could.

''Q. Is it probable?

''A. I would say highly improbable.''

Dr. T. M. Ahlquist, a physician and surgeon, who did not see Suren nor treat him, was called as a witness on behalf of appellant and the following appears in his testimony:

"Q. What kind of an injury must it be in order to produce pneumonia, must it be slight or severe?

"A. I think it would have to be a severe enough injury for it, for the impact of that blow to do damage to that moving lung in the lung cavity. When the text books speak of traumatic pneumonia they don't define the degree of traumatism. . . . .

"A. In order to have a trauma to the lung that blow must be sufficient to penetrate the skin, the fat and muscles of the chest wall. It must go through or between the ribs, pass through, the force of the blow, between the chest wall and the pleural cavity which varies from contact to an inch and a half, and then go on into the lung and do the damage. To me it is physically impossible when you think of the blows people have to their chests, prize fighters and all of us, for any ordinary blow to go through that chest wall and produce first, a congestion of the lung and then an infection following that to produce a traumatic wound, unless the tissues are lacerated and torn and then infected.

"Q. You have heard all the testimony here?

"A. I have.

"Q. You have heard the testimony as to the injury that the deceased is alleged to have had, as given by the witnesses for claimant?

"A. I have.

"Q. And from that testimony what is your opinion as to whether any injury caused in the way this was said and of the nature of that would have caused a lobar pneumonia?

"A. I think it is a physical impossibility for that man to slip down in a hole twelve inches deep, slip in a hole and strike his chin and slip over the log and have that blow do damage to the chest wall. I think it is a physical impossibility."

While the language of that testimony is a little confused, it is clear the witness meant to be understood that, in his opinion, it would be impossible for Suren to have contracted

pneumonia as a result of his accident as described by other witnesses.

There is no serious conflict in the evidence of the facts of the case. That Suren was in good health on the morning of the accident and that nothing was known to exist which would tend to cause him to have an attack of pneumonia, was shown by the undisputed testimony given by and on behalf of respondent; that he met with an accident which arose out of and in the course of his employment is not disputed; that the injury which he suffered from that accident did not, at the time, appear to be serious, is admitted; that within a short time after the accident he developed pneumonia, located in his left lung in the vicinity of the point on his chest which came in contact with the timber when he fell, and that he died therefrom a week after the accident is established; that trauma is one of the causes of pneumonia is undisputed, and is so recognized by the medical and legal professions. There is direct conflict in the testimony of medical experts as to the amount of injury necessary to produce traumatic pneumonia. Each testified, truthfully no doubt, as to his own opinion. This is not a dispute between witnesses as to a fact, it is a conflict of their opinions, probably growing out of differences in their experiences and educations.

It is possible the pneumonia from which Suren died was produced by some other cause than his injury, but there is nothing in the evidence tending to show it did. The onset of the disease, following as it did directly after the occurrence of the accident, is a circumstance strongly supporting the theory that it was caused thereby.

While it is incumbent on a claimant to establish the right to compensation by a preponderance of the evidence, it is not necessary that the cause of the injury or death relied on be proven to the exclusion of other possible causes. (*Roe v. Boise Grocery Co.*, 53 Ida. 82, 21 Pac. (2d) 910; *Riley v. Boise City*, 54 Ida. 335, 31 Pac. (2d) 968; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605; *Leach v. Grangeville Highway Dist.*, 55 Ida. 307, 41 Pac. (2d) 618; *Webb v. Gem State Oil Co.*, 56 Ida. 465, 55 Pac. (2d) 1302; *Wozniak v. Stoner Meat Co.*, 57 Ida. 439, 65 Pac. (2d) 768.)

There is not sufficient competent and substantial evidence to support the order of the industrial accident board denying compensation. Therefore, the judgment of the district court reversing that order and directing that compensation be awarded is affirmed. Costs to respondent.

Holden, Ailshie and Givens, JJ., concur.

Budge, J., dissents.