(No. 6711. December 13, 1939.)

REGINA NISTAD, Respondent, v. WINTON LUMBER
COMPANY, a Corporation, and WORKMEN'S COM-
PENSATION EXCHANGE, Appellants.

[99 Pac. (2d) 52.]

Nelson and Nelson, for Appellants.

J. Ward Arney and Clay V. Spear, for Respondent.

MORGAN, J.—This case has heretofore been before us on appeal by claimant from an order of the industrial accident board denying her compensation for the death of her husband. The opinion is reported in 59 Ida. 533, 85 Pac. (2d) 236. The facts stated in that opinion, which are applicable to this appeal, will not be restated.

The decision of the former appeal is expressed in the last paragraph of the opinion as follows:

"The order of the board is reversed and the cause remanded with directions that it take additional evidence as to the cause of deceased's death and make definite findings thereon."

That decision limited the board's investigation, at the hearing from which this appeal arose, to one question, to wit: Was decedent's death due to disease or was it due to an injury, by accident arising out of and in the course of his employment? The further hearing resulted in findings of fact, ruling of law and award of compensation in favor of claimant. This appeal is from the award.

The only conflict in the evidence is in the testimony of medical experts. A physician and surgeon, who was produced as a witness by respondent, and who assisted in an autopsy of the body of deceased, gave, as his opinion, based on his observations of the autopsy and the history of the case which he received from claimant and another person, that the death

was due to heart disease and that there had been an acute dilatation of the heart; that "the cause of death, without doubt, was heart disease and I felt from the history that was given there was probably an acute dilatation of the heart on the basis of the diseased heart condition that existed before. . . . . I am convinced the exertion was the thing that brought on the cause of death."

It appeared from the testimony of physicians and surgeons produced by appellants as witnesses that, in their opinion, based on the history of the case given by other witnesses and on the testimony of respondent's medical expert as to what he found at the autopsy, there had been no acute dilatation of the heart and that death had resulted from cerebral thrombosis—one of them stating, as his opinion, that death was caused from cerebral thrombosis or cerebral hemorrhage. The difference in opinions of medical experts sometimes has a tendency to becloud, rather than to clarify the issues in cases of this kind. It would be a blessing to some of the rest of us if the opinions of experts could be in agreement, but the hope for such a luxury would be an invitation to disappointment.

The testimony of an expert, as to his opinion, is not evidence of a fact in dispute, but is advisory, only, to assist the triers of fact to understand and apply other evidence. (*Evans v. Cavanagh,* 58 Ida. 324, 331, 73 Pac. (2d) 83, 85.) What was said about expert witnesses in *Suren v. Sunshine Min. Co.,* 58 Ida. 101, 108, 70 Pac. (2d) 399, 403, applies here:

"Each testified, truthfully no doubt, as to his own opinion. This is not a dispute between witnesses as to a fact, it is a conflict of their opinions, probably growing out of differences in their experiences and educations."

The action of the board in admitting certain hearsay testimony in evidence, which was, in part, made the foundation of expert opinion as to the cause of decedent's death, is assigned as error. That evidence is to be found in the testimony of respondent and a part of it is:

"Well it was the first part of May, about the third. One night he come home and he used to come home so happy and

that night he come home and he come in to dinner and he was so white, and I said 'what was the matter' and he said 'I had a funny experience. They were just through unloading some planks and I felt a strain and I couldn't do anything for a long time' and he said he tasted blood.''

She further testified that her husband said, ''I feel so choky and full here,'' indicating the chest and region of the heart. Respondent also testified with respect to her husband's appetite; that prior to May 3d, it was good ''and after that he ate less and less.''

Q. ''About stooping. Did he stoop over?

A. ''When he was going to stoop, he always let his whole body go down not to bend forward.

Q. ''What was his condition from May 3 on to the time of his death with reference to walking and stooping and things of that sort?

A. ''He would have to go slow about it.

Q. ''How about his appetite?

A. ''He took his lunch along and he never used to bring anything home but a little bit of pie for the children and then he came home with half his lunch most of the time after that.

Q. ''What do you say about his general condition between the third of May and the first of June when he died?

A. ''He couldn't eat what he used to and he couldn't do his work. He said he was so tired.

Mr. Nelson: ''Move to strike what he said.

Mr. Suppiger: ''It may be stricken.

Q. ''Was he energetic or tired?

A. ''He was tired.

Q. ''On this particular June first what was his condition when he left the house that morning?

A. ''I fixed his breakfast like I usually do and I didn't notice him eat because I fixed his dinner bucket in the meantime and I happened to turn around and he was sitting at the table and he was so white and I said 'Don't you feel good this morning?' He didn't answer me for a while and then he says he hopes he don't need to pile that day.

Mr. Nelson: ''Move to strike the answer as hearsay.

Mr. Arney: ''It is part of the *res gestae.*

Mr. Nelson: "It happened in the morning before he went to work. We move to strike it.

Q. "What time was this?

A. "About six o'clock.

Mr. Nelson: "Was there a ruling on that?

Mr. Suppiger: "Motion granted.

Q. "This was about six o'clock?

A. "Yes.

Q. "You say he was white?

A. "Just like a ghost.

Q. "Did you ask him about his condition at that time?

A. "I asked him and asked him if he didn't feel good.

Q. "What did he say?

Mr. Nelson: "We move to strike that as hearsay, and incompetent, irrelevant and immaterial.

Mr. Suppiger: "I think you are right but we will overrule your objection and let it go in.

Mr. Nelson: "We except.

Q. "What did you say and what did he say?

Mr. Nelson: "We make the same objection.

Mr. Suppiger: "Yes. The same ruling and exception I suppose.

A. "He didn't answer me and all he said was he hoped he didn't have to pile today and when he left the room—I had fried two eggs and he didn't touch them. He ate his cereal and drank his orange juice and he didn't touch the other fruit. He felt so bad. I noticed that.

Mr. Nelson: "Move to strike what he said as hearsay.

Mr. Suppiger: "Denied."

 The part of respondent's testimony wherein she described her husband's symptoms, his appetite and his actions tending to show his physical condition was competent, relevant and admissible, but the part wherein she related conversations between her husband and herself, not in the presence and hearing of appellants, was hearsay and should not have been admitted nor used by the board as proof. (Jones Commentaries on Evidence, Second Edition, vol. 3, p. 1986, sec. 1076.)

Among the findings of fact appears the following:

"That while engaged as above described at the sawmill of the defendant, Winton Lumber Company, the said Axel Nistad resided with his wife and two minor children on a 40-acre irrigated tract located three or four miles distant from the sawmill; that when he came home from work on the evening of the 3rd day of May, 1937, he was very pale and told his wife that he had had a funny experience that day and that as he was just through unloading some planks 'I felt a strain and I couldn't do anything for a long time' and 'tasted blood'; that he then also complained of feeling choky and full in his chest . . . . "

It is clear that hearsay testimony was not only used as a basis for expert opinion as to the cause of Nistad's death, but was relied on by the board in finding facts to support the award. This makes a new trial necessary.

■ ■ In a further hearing of this case the issues will be confined, as they were by our former decision, to an investigation of whether or not Nistad came to his death by accident arising out of and in the course of his employment. We again call attention to the rule, mentioned in the former opinion, that aggravation or acceleration of preexisting disease or weakened condition, if caused by accident arising out of and in the course of employment, is compensable.

In the application for hearing the following allegation as to the nature of the accident and injury appears:

"That on or about the 2nd or 3rd day of May, 1937, Axel Nistad, now deceased, sustained a personal injury by accident arising out of and in the course of his employment with the employer in Kootenai County, Idaho, in that while lifting a plank in the course of said employment, decedent accidentally exerted such strain as to injure the heart of said decedent, immediately thereupon experiencing symptoms of said injury by tasting blood and sensing a sharp, tearing pain in the region of the heart, with resultant inability to move or walk, except in a slow manner, with difficulty in breathing and with inability to bend or stoop; that on or about May 6th, 1937, in consequence of said accidental injury, said decedent obtained a hospital ticket from the employer; that thereafter the decedent continued at said employment until June 1st, 1937, continuously experiencing said disabilities and symp-

toms; that on June 1st, 1937, in the course of said employment with said employer, and while lifting a plank on the top of a pile of lumber at the mill of said employer in Kootenai County, Idaho, and in exerting effort in the lifting and placing of said plank, decedent suddenly died from said injury to said heart, and solely as a result thereof; that prior to the times herein mentioned, decedent had worked steadily and continuously at said employment, without experiencing any disability whatsoever.''

 On a further hearing of this case, should it be found Nistad came to his death by so exerting himself in the line of his employment and in the discharge of his duty to his employer, as to aggravate or accelerate a preexisting disease or weakened condition of his body, and that his death was hastened as a result thereof, whether his injury was an acute dilatation of the heart, cerebral thrombosis or cerebral hemorrhage, compensation should not be denied respondent because of variance between the allegation in her claim and the proof adduced at the trial. The parties litigant are fully aware of each other's contentions and such a variance is immaterial within the meaning of I. C. A., sec. 5–901, which is as follows:

''No variance between the allegation in a pleading and the proof is to be deemed material unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it appears that the party has been so misled, the court may order the pleading to be amended upon such terms as may be just.''

It is again contended that it was not proven notice of the accident was given to the employer as soon as was practicable, and not later than sixty days after it happened, as required by statute. That contention was disposed of in the former opinion.

The order awarding compensation to respondent is reversed and the cause is remanded to the board for further proceedings consistent with the views herein expressed. The awarding of costs on appeal will abide a final decision.

Budge, Givens and Holden, JJ., concur.

Ailshie, C. J., did not participate in the decision of this case.