(No. 7023. July 10, 1942.)

BEULAH KAONIS, widow, on behalf of herself and minor adopted son, Donald Keith Kaonis, Appellant, v. OHIO MATCH COMPANY and FIREMAN'S FUND INDEMNITY CO., Respondents.

[127 Pac. (2d) 776.]

J. Ward Arney for appellant.

Everett E. Hunt for respondents.

BUDGE, J.—Nicholas J. Kaonis on the first day of September, 1941, and for some fourteen years prior thereto was a seasonal employee of the Ohio Match Company at one of its logging camps in Kootenai County. On the latter date about 1:20 p. m., Mr. Kaonis was suddenly stricken with acute heart failure from which he died. Appellant, widow of deceased, on behalf of herself and her minor son, made application to the Industrial Accident Board for compensation upon the theory that the death of her husband was accidental and incurred in and as a result of his employment. The board denied compensation from which denial this appeal is prosecuted.

The board's findings of fact, rulings of law and order, so far as material here, are as follows:

"That on, and for some time prior to, the 1st day of September, 1941, the defendant, Ohio Match Company, was engaged in a trade or occupation for the sake of pecuniary gain, namely, in the business of logging and lumbering in the County of Kootenai, * * *, and during all of said time had secured the payment of compensation to its employees by depositing and maintaining with the Industrial Accident Board a surety bond issued by the defendant, Fireman's Fund Indemnity Company.

"That on the said 1st day of September, 1941, Nicholas J. Kaonis, was in the employ of the defendant, * * * working in the business carried on by it * * * and during all of said time had been an unusually strong and healthy man.

"That approximately two or three weeks before the 4th day of August, 1941, while engaged in his work for the defendant * * * * the said Nicholas J. Kaonis, received an injury to his leg; that on account of said injury * * * the claimant lost only one day from his regular work; that on or about the 4th day of August, 1941, in the course of his employment with said Ohio Match Company one of the thumbs of said Nicholas J. Kaonis was mashed and cut by being crushed in a pulley; that said injury to his thumb was an injury resulting from an accident arising out of

and in the course of his employment with said defendant * * * and by reason of said injury he was totally disabled for work from the said 4th day of August, 1941, to the 1st day of September, 1941, and between said two last mentioned dates he did no work.

"That on the first day of September, 1941, as a part of his work and duty as an employee of the defendant * * * the said Nicholas J. Kaonis was working on a deck of logs approximately six feet high, handling logs sometimes 32 feet long and from seven inches to 2½ feet in size; that said logs were lifted to said deck with a hook attached to a dragline, and when said logs were brought to the deck by said line the said Kaonis would put them in place by means of a peavy while the logs were still suspended; that after they were in place he was required to, and did, stamp each log two or three times with a stamping hammer weighing about 1½ pounds; that it tooks approximately five minutes on an average to place a log on the deck and stamp it; that on the morning of said September 1st, 1941, the work said Kaonis was doing was about average and relatively easy; that shortly after he had placed a certain log on the deck and at about 1:20 p. m. of said date, said Kaonis gave the operator of the dragline the 'high sign' and then started using the stamping hammer and almost immediately thereafter was found lying on a log face down.

"That when said Nicholas J. Kaonis was found, as above stated, he was dead; that the said Nicholas J. Kaonis did not die as a result of any personal injury by accident arising out of his employment with the defendant * * * and that the injury to his thumb sustained by him on August 4, 1941, was not the cause of his death and did not contribute thereto."

From the foregoing findings of fact the board made the following ruling of law:

"That the claimant, Beulah Kaonis, is not entitled to an award for compensation for the use and benefit of herself and her adopted son * * * against the defendants, Ohio Match Company, employer, and the Fireman's Fund Indemnity Company, surety, or either of them, and that her claim for compensation should be denied and her application dismissed; that an order should be given, made, filed and entered accordingly."

Whereupon the board made the following order:

"WHEREFORE IT IS ORDERED AND THIS DOES ORDER That the claimant, Beulah Kaonis, take nothing by these proceedings and that her claim for compensation for the use of herself and her minor adopted son, * * * against the defendants, Ohio Match Company, employer, and Fireman's Fund Indemnity Company, surety, and each of them, be, and the same hereby is, denied and her application dismissed."

Appellant specifies and relies upon the following assignments of error: First, that the board erred in finding that "* * * the work that Kaonis was doing was average and relatively easy." Second, in finding that "* * * Kaonis did not die as the result of any personal injury by accident arising out of his employment with the defendant * * *." Third, in finding that "* * * the injury to his thumb sustained * * * August 4, 1941, was not the cause of his death and did not contribute thereto." Fourth, in "not finding casual connection between the August 4th, 1941 thumb injury, the consequent month's inactivity and the fatal strain suddenly exerted on the heart by resumption of unaccustomed employment involving strenuous activity." Fifth, in "Not concluding and ordering award of compensation to claimant; the findings of fact not supporting the order or award as a matter of law."

The first three assignments of error are based upon the theory that the board's findings are not supported by any substantial, competent evidence. The fourth and fifth assignments of error are based upon the theory that there was sufficient, competent evidence to support an award in appellant's favor. Taking up the assignments of error in the order above indicated and directing our attention to the evidence in the record that the work Kaonis was doing was average and relatively easy, we find that witness Heineman, deceased's co-employee, called on behalf of appellant, testified:

"Q. Was this work Nick was doing hard or easy work?

"A. I would say fairly hard work, plenty active—you got to be active on your feet if you are going to keep from getting hurt and getting anything done."

"Q. That morning, was Nick active, or inactive, or keeping on the move?

"A. He was plenty active. Nick always a good man on

his feet and he was plenty active, and apparently all right."

Witness May, co-employee of deceased, called on behalf of appellant, was asked and made answer to the following questions:

"Q. On that particular morning, had Nick been active on the work, or was he loafing on the job—was it active work?

"A. It was active work—sometimes you had a little time and sometimes you didn't.

"Q. That particular morning.

"A. That was about an average morning run—sometimes you would have a minute and sometimes you wouldn't have that minute.

\* \* \*

"Q. Was that work he was doing that morning relatively arduous work, hard work—or relatively easy?

"A. An average thing—only at times he possibly would have to take the peavy and take a [lift] life—it was relatively easy.

"Q. It was relatively active work?

"A. Yes.

"Q. It was active work?

"A. You wouldn't want to monkey around, you had to get out of the way, the log was swinging through the air, and you had to be able to get out of the way.

"Q. You had to be fast on your feet?

"A. You did, for a fact."

Dr. Sturgess, witness for respondent, upon cross-examination testified as follows:

"Q. Doctor; I don't want to get out of your professional field, but you know as a matter of fact, top decking is pretty heavy work?

"A. It is the lightest part of the loading."

 The board found that on the morning of September 1st, 1941, the work Kaonis was doing was about average and relatively easy. While the evidence in this respect may not be of the strongest character, we do not feel that we would be justified in holding that there was not any substantial, competent evidence to support the board's finding. Where there is a conflict in the evidence, or where there is

any substantial, competent evidence to support the board's findings, they will not be disturbed. (*Stroscheim v. Shay*, 63 Ida. 360, 120 P. (2d) 267, and cases therein cited.)

It is next contended that there is no substantial, competent evidence to support the board's finding that Kaonis did not die as a result of any personal injury by accident arising out of and in the course of his employment, and that the injury to his thumb, sustained on August 4, 1941, was not the cause of his death and did not contribute thereto.

Dr. Greenwood on behalf of appellant testified:

"A. * * * An examination of the body didn't reveal any bruises or external evidences of injury of any kind. The color was slightly paler than normal, however, the man had been dead for several hours. I saw him at 6:30 in the evening, and it was around between twelve and one, or one and two, I forget which, that the man was supposed to have died. With the absence of blood from the mouth and ears and nose, and the absence of external injury, and the almost normal color—the paleness was due to the settling of the blood on the trip into town—the fact that this man had been working right along up until the time, led me to a diagnosis of acute dilatation of the heart.

"Q. In making that diagnosis, did you take into consideration his work record for the last two or three months before that?

"A. I took into consideration the fact that he had been off for almost a month preceding going back to work and that this was his first day back on the job.

"Q. Doctor, will you explain what elements you have taken into consideration in arriving at the diagnosis you have just given?

"A. Working men, where they are working steadily develop a certain heart capacity which will stand the vigorous exercise which they take—the same man after a month or so lay off, if he attempts to exercise, the heart won't stand up over a certain length of time. I have had experiences of that sort where we did post-mortem and found ruptured hearts. In this case, this man had been a steady worker for years and he had layed off for a month and going back on the job—he had not done as they do in the spring, but he had gone right back to doing his regular work and the other boys were all toughened into it, and

under that setup, without any evidence of injury, complaint of any kind, and the sudden death, I diagnosed it acute failure of the heart.

"Q. What relation, in your opinion, did the strain of his muscles have to the acute condition of the heart?

"A. Overstrain of the cardiac muscles over a period of time—the heart wouldn't stand it.

"Q. To what degree, possible, probable or certain.

"A. I wouldn't make a certain statement without a post-mortem but it is very highly probable.

(On cross-examination.)

"Q. * * * in other words under the circumstances, there was no post-mortem held and therefore, at this time there is no positive proof as to what caused the death of Mr. Kaonis?

"A. That's right.
* * *

"Q. Would you state, in your opinion, that the injury to the thumb was the cause of his death?

"A. If you mean a direct cause of his death, I would say no—indirectly with the inaction, I think the inaction is the thing that probably caused it."

The following hypothetical question was read to Dr. Wood, witness for appellant:

"Q. The record, Doctor, shows that Mr. Kaonis, on September 1st, 1941, was a man of forty-five years, that his business was that of a lumberman, that is, a logger, he habitually being employed in the woods in the logging season, and that during the time that they were not logging he was employed in the management and operation of a farm in this community, and that he did all of the work on that farm; the record shows that physically Mr. Kaonis was above average; that his health was good; that he never had had any serious illnesses; that in the summer of 1941, he suffered an injury to his leg which incapacitated him for, I believe, one day, and that on the 4th day of August, 1941, he suffered an injury which may be described as a flesh injury to one thumb; that because of this injury he was unemployed from the 4th day of August until the following first day of September, approximately twenty-eight days, and that on the first day of September, he

returned to his work as a top loader in the woods; that he worked all of that morning; that he and his fellow workmen stopped during the noon hour for their lunch, ate the usual ordinary lunch, and by the way, Mr.—the appetite of Mr. Kaonis was normal, he was a hearty eater; that after returning to work, he worked until about one-thirty at which time one of his fellow employees saw his body sprawled over some logs on the skidway; that this employee called another fellow employee and they went to Mr. Kaonis who at the time was still alive; that Mr. Kaonis gasped once or twice; that he was unable to speak and in a few minutes they decided that he was dead, and he was dead; the body was brought to a mortuary in Coeur d'Alene, no post-mortem was held—there were no contusions or bruises or marks on his body, no blood from the mouth or nostrils; that his color, when the two men picked him up, was practically normal, and in about fifteen minutes or so it turned a paler color—under that set of facts, Doctor, what would you say was the probable cause of that death?

\* \* \*

"A. You want to know [what] \* \* \* I think is the cause of death?

"Q. The probable cause.

"A. With that description, I would say he had an acute heart attack.

"Q. What relation, in your opinion, would the employee's strain have upon the heart condition?

"A. It would increase chances, of course. And any violent exercise would increase chances of getting in trouble with a heart condition.

"Q. Could you, from that set of facts, state the possibility as to the character of the heart action that occurred in this instance?

"A. I know as much about it as anyone else when a post-mortem is done. Possibly it might have been an acute dilatation of the coronary—possibly an acute dilatation.

"Q. I will ask a further question. The inaction from work to September 1, 1941, what relation, in your judgment, would that have to the resulting death?

"A. It would naturally be contributory to some extent.

"Q. Is that in the realm of possible, probable or certain?

"A. I would put it as probable.

(On cross-examination.)

"Q. Now, Doctor, no post-mortem was held over the body of Mr. Kaonis—under those circumstances, state whether or not anyone can definitely state the cause of the death of Mr. Kaonis?

"A. Does definitely mean positively?

"Q. Yes.

"A. No, they cannot.

"Q. And the same holds true, does it not, relative to the twenty-eight day lay-off—no one can state definitely whether this twenty-eight day lay-off was contributory to the death?

"A. I think all you could say was that it would be probable it would be contributory—it wouldn't be positive, no."

Dr. Husted testified on respondent's behalf:

"Q. Did you have occasion to· treat him [Kaonis], his thumb injury on about the 4th of August?

"A. Dr. Fox and I attended him together.

"Q. What was the nature of the thumb injury?
* * *

"A. * * * just a bad bruise with a little splitting of the skin, not very much.

"Q. Doctor, the record shows that Mr. Kaonis did not work after his injury to the thumb between the days of August 4th and September 1st, approximately twenty-eight days, and that on the 1st of September he returned to his employment as a top loader for the Ohio Match Company; that he worked all morning on September 1, stopping for his noon hour and returned to work after lunch, all of the time that day he acted as a top loader, and that about the hour of one-thirty p. m. of that day a fellow workman discovered him lying over a log on the skidway, and that the fellow workman went to him with a bag of water, turned him over, Mr. Kaonis did not speak, the witness stated that he gasped once or twice, apparently in an effort to get his breath, but that he never spoke, and that they decided at that time that he was dead—state, Doctor, whether or not in your opinion, the injury to the thumb sustained on August 4, was or was not the cause of the death of Mr. Kaonis.

"A. No, I don't think it was the direct cause.

"Q. Doctor, in a case here the record discloses that a man was forty-five years of age, always in good health, stronger physically than the average person, a man who worked in this vicinity for several years in the woods in the logging industry during the logging season and when not engaged in logging was engaged in operating a farm of his own, he doing all of the work on the farm—state whether or not in your opinion a lay-off for such a man from the 4th day of August to the 1st day of September of the same year would be sufficient to cause the death of such a person engaged in logging as described herein, whether or not such a lay-off would tend to cause death when the individual in question returned to his ordinary employment?

"A. No, I don't think it would, assuming as you have that he was in good physical condition."

Dr. Fox, witness for respondent, testified substantially to the same effect as Dr. Husted, namely, that it would be hard to conceive that it was possible that the injury to the thumb had any connection with the cause of Kaonis' death, and that the cause of Kaonis' death in his opinion was not due to the long lay-off from August 4th to September 1st, 1941.

Dr. Sturgess, after having had read to him the hypothetical question read to Dr. Wood, testified:

"Q. * * * now, would you, under those circumstances, Doctor, state whether or not the injury to the thumb which I have described, would be the cause of the death of Mr. Kaonis?

"A. No, I think not.

"Q. Doctor, I have heretofore described the physical condition of Mr. Kaonis at the time of his death and prior thereto, and have stated to you his occupation for many years past, state whether or not in your opinion, a lay-off by Mr. Kaonis from his usual work from the 4th day of August, 1941, to the 1st day of September, 1941, approximately twenty-eight days, would, in your opinion, be the cause of his death when he returned to his usual and ordinary employment?

"A. No, sir."

On cross-examination, the Doctor among other things testified:

"Q. It wouldn't be recommended after a man had been absent from hard work from the 4th day of August to the 1st of September to put him back on, as far as his heart is concerned?

"A. I don't think it would make any difference.

"Q. Wouldn't make any difference—you don't think the activity would put him under a strain?

"A. I don't think so.

"Q. You think you can lay off a month and go back to hard work and not put his heart to a strain?

"A. I think so."

Appellant urges that the acute heart attack, resulting in Kaonis' death, was due to the fact that he became so weak by a lay-off of twenty-eight days that the strain upon his heart when he returned to work caused his death. It is clear from the testimony of the experts that Kaonis died from acute heart failure; that there is a direct conflict as to whether or not the fact that Kaonis laid off, due to his thumb injury, from his usual work for a period of twenty-eight days, caused his death upon resumption of his usual and ordinary employment, which being true, the board's findings will not be disturbed. The findings of the board when supported by any substantial, competent evidence, or where there is a conflict in the evidence will not be disturbed. The jurisdiction of this court being limited to review of questions of law only. (*Stroscheim v. Shay,* supra.)

It follows that the order of the board denying compensation will be sustained. Costs awarded to respondents.

Givens, C. J., and Ailshie, J., concur.

MORGAN, J., dissenting.—The question of fact involved in this case is as to whether Kaonis died as the result of an accident arising out of and in the course of his employment. If the exertion, incident to his employment, caused his death, it is a compensable accident according to the decisions of this court.

In Re Larson, 48 Ida. 136, 279 Pac. 1087, the court rejected the theory that, in order to be compensable, an injury must result from an accident such as "slipping, falling or unexpected happening outside of and disconnected with the personal injury." The fourth section of the syllabus in that case contains the following:

"Where, as result of employee's lifting tackle into wagon and attempting to put burr on bolt, latent physical defect, aneurism, was accelerated or aggravated and progressed further, causing death, strain, even though not unusual, was an accident that was compensable under Workmen's Compensation Act, * * *"

See, also, *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605; *Cook v. Winget*, 60 Ida. 561, 94 Pac. (2d) 676; *Hieronymus v. Stone's Food Stores, Inc.*, 60 Ida. 727, 96 Pac. (2d) 435; *Pinson v. Minidoka Highway District*, 61 Ida. 731, 106 Pac. (2d) 1020; *Aranguena v. Triumph Mining Co.*, 63 Ida. 769, 126 Pac. (2d) 17. In the Pinson case, above cited, it is said:

"An 'accident' occurs in doing what the workman habitually does if any unexpected, undesigned, unlooked-for or untoward event or mishap, connected with or growing out of the employment, takes place."

In this case, Kaonis died, suddenly and unexpectedly, while performing the duties of his employment, and while doing what he habitually did. His death was unexpected, undesigned, unlooked for, and was accidental, within the meaning of the Workmen's Compensation Law as we have construed it, frequently.

A number of witnesses, who had known Kaonis ten years or more, had never heard of his being sick. The only accidents he is shown to have suffered was one to his leg, which caused him to lay off from work a day, and one, which occurred August 4, 1941, which resulted in his thumb being mashed, and caused him to remain inactive until September 1, 1941, the day of his death. On that day, after having remained idle for a period of four weeks, Kaonis resumed his labor as a top loader, in decking logs for respondent, Ohio Match Company. That work required the services of a man who was strong and nimble, in order that he might perform the labor and keep out of the way of logs being hoisted by a jammer and dropped on the deck.

The work Kaonis was doing on the day of his death and a few minutes before he died, was hard labor. With respect to it, Herbert H. Heineman, a co-laborer on the job, testified:

"Q. Was this work Nick was doing hard or easy work?

"A. I would say fairly hard work, plenty active—you got to be active on your feet if you are going to keep from getting hurt and getting anything done.

"Q. That morning, was Nick active or inactive, or keeping on the move?

"A. He was plenty active. Nick always a good man on his feet and he was plenty active, and apparently all right. "* * *

"Q. What did you mean when you said getting down off the deck and unhooking the tongs?

"A. With gypo work we want to save time, we had to go fast to make it and this jammer has got a lot of power— if we could get a log up to the skidway before another log come, he unhooked the tongs and grabbed one log—we tried to deck one log before another one came.

"Q. You and the man on the deck would try to get the log decked before the man got back up to the deck?

"A. We tried to.

"Q. Would the man on the deck have to get on the ground?

"A. He would have to get off the deck.

"Q. To the ground?

"A. Yes.

"Q. Gypo work?

"A. Yes.

"Q. You were paid for as much as you produced?

"A. By the log.

"Q. Were you all working pretty fast?

"A. As fast as we could stand it."

Kaonis was an unusually strong, active man, forty-five years old. None of the witnesses heard him complain of any ailment, on the day of his death, nor at any other time. He worked during the forenoon of September 1, 1941, and, after a hearty lunch, to about twenty minutes after one o'clock of the afternoon of that day. While he was on the log deck, about six feet above the ground, decking logs, hoisted by the jammer, he fell therefrom and died immediately. No one saw Kaonis fall from the log deck, and the statement that he fell therefrom is based on the position of his body when it was found, and from the following testimony of the witness, Heineman, who was running the jammer at the time:

"Q. Were you in a position where you could see Nick all or part of the time?

"A. If I had been watching, I could see him, yes.

"Q. And it was your duty to watch him and Mr. May and the dragline and the log, as well as the motor?

"A. That's right.

"Q. Now, you just tell the board in your own way how you saw this picture out there that day?

"A. Nick handed the tongs down to Mr. May and he took them to the woods, and possibly three or four minutes, it might not have been that long, and then he, Nick, gave me the 'high sign' to go ahead—I couldn't see Mr. May."

Commissioner Langley: "Q. Where was Nick when he gave you the 'high sign'?

"A. Standing on the lower side of the deck possibly about three logs up. It was his business to watch Mr. May so I would know when to go ahead, and he gave me the 'high sign'.

"Q. Who—Nick?

"A. Yes. And then he apparently went and picked up the branding hammer and started to brand the logs. He always stayed on the end of the deck away from the line. He had to walk about six feet. That is what he was doing when I started to bring the log up. I was watching where the line was on account of dry snags hitting the line and hitting someone—it might fall and come up over the deck, which has been done before. I never, I hadn't watched him, I had my eyes off him maybe one minute and I happened to glance to where he should have been and he wasn't there, and I stopped—I released the friction and set the brake, and seen him laying in the skidway.

"Q. How far from him?

"A. To the end of the line.

"Q. Twenty or thirty feet?

"A. About thirty or thirty-five feet. I took the water bag and run down and tried to get him up. He was laying over the logs, had his head over the logs—one leg was over the logs and his head was laying over and against the bank. * * *"

Five physicians and surgeons testified in this case, and their professional qualifications were admitted. Dr. Greenwood (called by appellant) who examined the body of Kaonis, about five hours after his death, testified:

"* * * With the absence of blood from the mouth and ears and nose, and the absence of external injury, and the almost normal color—the paleness was due to the settling of the blood on the trip into town—the fact that this man had been working right along up until the time, led me to a diagnosis of acute dilatation of the heart.

"Q. In making that diagnosis, did you take into consideration his work record for the last two or three months before that?

"A. I took into consideration the fact that he had been off for almost a month preceding going back to work and that this was his first day back on the job.

"Q. Doctor, will you explain what elements you have taken into consideration in arriving at the diagnosis you have just given?

"A. Working men, where they are working steadily develop a certain heart capacity which will stand the vigorous exercise which they take—the same man after a month or so lay-off, if he attempts to exercise, the heart won't stand up over a certain length of time. I have had experiences of that sort where we did post-mortem and found ruptured hearts. In this case, this man had been a steady worker for years and he had laid off for a month and going back on the job—he had not done as they do in the spring, but he had gone right back to doing his regular work and the other boys were all toughened into it and, under that set-up, without any evidence of injury, complaint of any kind, and the sudden death, I diagnosed it acute failure of the heart."

Dr. John T. Wood, also called by appellant, after the facts leading up to the death of Kaonis had been stated to him in a hypothetical question, was asked:

"* * * under the set of facts, Doctor, what would you say was the probable cause of that death? * * *

"A. You want to know what I think is the cause of death?

"Q. The probable cause?

"A. With that description, I would say he had an acute heart attack."

Dr. Harold J. Sturgess, called on behalf of respondents, testified, in response to a hypothetical question stating the

facts and describing the events leading up to the death that, in his opinion, the injury to Kaonis' thumb was not the cause of his death; also that, in his opinion, the cessation of his labors from August 4, 1941 to September 1, 1941, did not cause his death, when he returned to his usual and ordinary employment.

Dr. O. M. Husted, a physician and surgeon called by respondents, after the hypothetical question, above referred to, was propounded to him, was asked:

"* * * state whether or not in your opinion a lay-off for such a man from the 4th day of August to the 1st day of September of the same year would be sufficient to cause the death of such a person engaged in logging, as described herein, whether or not the lay-off would tend to cause death when the individual in question returned to his ordinary employment?

"A. No, I don't think it would, assuming as you have, that he was in good physical condition."

Dr. E. R. Fox was called by respondents and, after the hypothetical question, above mentioned, had been read to him, was asked:

"Q. * * * under those circumstances, Doctor, would you say whether or not the injury to the thumb was the cause of the death of Mr. Kaonis?

"A. I don't believe the injury to the thumb was the cause.

"Q. Would you say there was any connection between the injury to the thumb and the death?

"A. It is hard for me to conceive that possibility.

"Q. Doctor, having described the general physical condition of Mr. Kaonis, state whether or not in your opinion, the death of this individual was caused by a lay-off of from August 4, to September 1st, in other words, would the going back to work after a lay-off of approximately twenty-eight days be sufficient to, in your opinion, cause the death of Mr. Kaonis?

"A. No."

With respect to expert medical testimony, elicited by hypothetical questions, where the witness has not had an opportunity to make personal observation, but is testifying to an opinion based on an assumed state of facts, we said, in *Evans v. Cavanagh*, 58 Ida. 324, 331, 73 Pac. (2d) 83, 85:

"In one particular this case resembles *Suren v. Sunshine Min. Co.*, 58 Ida. 101, 70 Pac. (2d) 399. There is little or no conflict in the evidence other than in the testimony of medical experts. The testimony of an expert as to his opinion is not evidence of a fact in dispute, but is advisory, only, to assist the triers of fact to understand and apply the testimony of other witnesses."

With respect to such testimony, we further said, in *Suren v. Sunshine Mining Co.*, 58 Ida. at 108, 70 Pac. (2d) at 403:

"Each testified, truthfully no doubt, as to his own opinion. This is not a dispute between witnesses as to a fact, it is a conflict of their opinions, probably growing out of differences in their experiences and educations."

See, also, *Nistad v. Winton Lumber Co.*, 61 Ida. 1, 99 Pac. (2d) 52; *Watkins v. Cavanagh*, 61 Ida. 720, 107 Pac. (2d) 155.

The diagnosis, made by Doctors Greenwood and Wood, that Kaonis died of heart failure, is neither disputed nor criticized. The difference of opinion between them and the physicians and surgeons who testified for respondents is as to whether the work he was doing, when he died, following a period of inactivity and idleness, caused his death. No theory was advanced, as to the cause of death, other than that it was produced by his employment. It is true the cause of death has not been established conclusively, beyond reasonable doubt, but that is not necessary. In *Newman v. Great Shoshone etc. Power Co.*, 28 Ida. 764, 768, 156 Pac. 111, 112, we quoted from the opinion on rehearing in *Adams v. Bunker Hill etc. Mining Co.*, 12 Ida. 637, 650, 89 Pac. 624, 628, as follows:

" 'There are very few things in human affairs, and especially in litigation involving damages, that can be established to such an absolute certainty as to exclude the *possibility*, or even some *probability*, that another cause or reason may have been the true cause or reason for the damage rather than the one alleged by the plaintiff. But such *possibility*, or even probability, is not to be allowed to defeat the right of recovery where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence as to justify a reasonable juror in concluding that the thing charged was the prime and moving cause.' "

In *Roe v. Boise Grocery Company*, 53 Ida. 82, 21 Pac.

(2d) 910, we applied that rule to workmen's compensation cases. See, also, *Riley v. Boise City*, 54 Ida. 335, 31 Pac. (2d) 968; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605; *Leach v. Grangeville Highway Dist.*, 55 Ida. 307, 41 Pac. (2d) 618; *Webb v. Gem State Oil Co.*, 56 Ida. 465, 55 Pac. (2d) 1302; *Wozniak v. Stoner Meat Co.*, 57 Ida. 439, 65 Pac. (2d) 768; *Suren v. Sunshine Mining Co.*, 58 Ida. 101, 70 Pac. (2d) 399; *Pierstorff v. Gray's Auto Shop*, 58 Ida. 438, 74 Pac. (2d) 171.

In *Suren v. Sunshine Mining Co.*, above cited, the rule is stated thus:

"While it is incumbent on a claimant to establish the right to compensation by a preponderance of the evidence, it is not necessary that the cause of the injury or death relied on be proven to the exclusion of other possible causes."

The order appealed from should be reversed with direction to make an award in favor of appellant.

I am authorized by Justice Holden to say he joins in this dissent.