(No. 6653.   June 4, 1940.)

DEPARTMENT OF FINANCE OF THE STATE OF IDAHO; FRANK H. GEISLER, a Sole Trader Doing Business Under the Firm Name and Style of GEISLER BEVERAGE COMPANY, Respondents, v. UNION PACIFIC RAILROAD COMPANY, a Corporation; W. C. RICHMOND, M. P. OCHELTREE and LEVI HANKINS, Appellants.

[104 Pac. (2d) 1110.]

Geo. H. Smith, H. B. Thompson and L. H. Anderson, for Appellants.

Chapman & Chapman, Lionel T. Campbell, J. T. Murphy and C. L. Hillman, for Respondents.

BUDGE, J.—August 3, 1937, about 6:20 P. M. within the city of Twin Falls at an intersection of U. S. Highway No. 30, known as the "truck lane" and a spur or switch track of appellant railroad a collision occurred between a switch engine of appellant railroad being backed across the truck lane upon the spur track and a small panel delivery truck driven by Marcel Geisler, a minor employed by Geisler Beverage Company the trade name used by Frank H. Geisler, father of Marcel Geisler. The cause was tried before a jury, appellants interposed motions for nonsuit and directed verdict, which were denied, and the jury returned a verdict in favor of respondents for personal injuries received by Marcel Geisler. Judgment was entered and this appeal taken.

Appellants urge that the court erred in giving and submitting to the jury instructions numbered 16 and 17[1] for the reason that there was evidence of eyewitnesses establishing the fact that Marcel Geisler was not in the exercise of ordinary care in approaching and attempting to cross over the tracks and particularly in that he was violating the provisions of subdivision 1 of par. (b), section 48–504, I. C. A., and accordingly the presumption is that he was not in the

---

[1] "16. You are instructed, gentlemen of the jury, that if you find from the evidence that Marcel Geisler, as a result of the injuries sustained by him, has suffered a total lapse of memory of the occurrence of the collision or the events leading up to its occurrence, then in that event there is a presumption created by law that said Marcel Geisler while attempting to cross the railroad tracks in question, was exercising due and proper care for the protection of his person and the preservation of his life, and this presumption in itself is sufficient to constitute *prima facie* evidence that said Marcel Geisler was at the time of the collision, free from contributory negligence. In this connection, you are further instructed that in determining whether or not

exercise of reasonable care but was guilty of negligence which was a proximate cause of the collision.

The statute to which appellants refer, section 48–504, I. C. A., provides:

"b. Subject to the provisions of subdivision a of this section and except in those instances where a lower speed is specified in this chapter, it shall be *prima facie* lawful for the driver of a vehicle to drive the same at a speed not exceeding the following, but in any case when such a speed would be unsafe it shall not be lawful.

"1. *Fifteen miles an hour when approaching within fifty feet of a grade crossing of any steam . . . . railway when the driver's view is obstructed.* A driver's view shall be deemed to be obstructed when at any time during the last two hundred feet of his approach to such crossing he does not have a clear and uninterrupted view of such railway crossing and of any traffic on such railway for a distance of four hundred feet in each direction from such crossing; . . . .

"*It shall be prima facie unlawful for any person to exceed any of the foregoing speed limitations,* except as provided in subdivision c. of this section. (Emphasis inserted.)

Appellants' contention appears to be briefly that it was established by the evidence that Marcel Geisler did not have an unobstructed view for a distance of 400 feet when he was 200 feet away from the crossing and therefore subdivision b, 1, of section 48–504, *supra,* applies and that the uncontroverted evidence of a witness for respondents is that Marcel Geisler drove at a speed in excess of fifteen miles an hour, to wit: Twenty miles an hour, and his conduct in so doing was *prima facie* unlawful and that the instructions were therefore improper.

---

Marcel Geisler was guilty of contributory negligence, you have the right to consider this presumption in connection with all the other facts and circumstances in evidence."

"17. The court instructs you, gentlemen of the jury, that the term '*prima facie* evidence', as elsewhere used in these instructions means such evidence of a fact as in the judgment of the law is sufficient to establish the fact, and if not rebutted remains sufficient for that purpose. It is evidence that raises such a degree of probability in its favor that it must prevail unless rebutted or the contrary proved."

The testimony of Walter Gates, a witness for respondents, with relation to speed, urged to have the effect of defeating the presumption referred to in instructions sixteen and seventeen is to the following effect:

Gates driving a truck loaded with hay entered the truck lane from a side street at a point 700 feet from the point of the collision and while there stopped preparatory to entry upon the truck lane the panel truck driven by Marcel Geisler passed. Gates was then questioned and answered as follows:

"Q. And after you got onto the truck lane what distance were you from this truck?

"A. Well, when I pulled out onto the highway there right behind it, but the truck, of course it gained speed on me while I was changing gears.

"Q. And what would you say as to the relation of the speed of the truck to your speed after you started westward on the truck lane?

"A. Well, I would say I was going between 15 and 18, and I would say he was going 20; he was gaining a little bit on me."

The witness then related how he started in low from the side street, traveled probably 30 feet in low into and upon the truck lane, then shifted into second and finally into high gear, and his cross examination by counsel for appellants then continued as follows:

"Q. And while you were doing that this delivery truck got on how far ahead of you before you got straightened out on the highway?

"A. Well, I couldn't say: I'd say approximately 100 feet, maybe a little more.

"Q. A hundred feet and maybe more?

"A. Yes.

"Q. If he was going 20 miles an hour or a little faster before you started out he would be more than a hundred feet ahead of you before you got your car in low gear and up on the highway and straightened out and in high gear, wouldn't he, or in second gear?

"A. He could have, but he wasn't, I don't believe.

"Q. Now can you tell how fast a car is going when it is either ahead—either headed directly away from you or coming directly towards you?

"A. *No.*"

and:

"Q. And when Geisler's automobile and the engine collided with each other, when they did, at what rate of speed, in your opinion, was Geisler driving?

"A. Well, I was going between 15 and 18, and I'd say he was going about 20 miles an hour.

"Q. You were doing as much as 18 miles an hour, weren't you?

"A. Yes, sir, I'd say I was.

"Q. And he was going faster than you?

"A. He didn't pick up much ahead of me after I got lined out in high gear."

The first speed of Marcel Geisler, 20 miles an hour, related by the witness was in the neighborhood of 700 feet from appellants' tracks. The witness gave his speed as 15 to 18 miles an hour, apparently this covering the entire 700 feet, with no evidence of his speed at any particular point. By their own cross-examination appellants nullified to some degree at least the witness Gates testimony as to the speed of the Geisler truck by first eliciting the answer from Gates that if Geisler was traveling 20 miles an hour before Gates started "he could have" been "but he wasn't, I don't believe" more than 100 feet ahead of Gates before Gates got his car in low, high or second gear. Further appellants secured the positive answer "No" from Gates when asked if he could tell the speed of a car headed directly away from him. The remaining testimony of Gates with relation to speed of the Geisler truck was "when Geisler's automobile and the engine collided with each other," and not "when approaching within fifty feet of" the crossing. What Marcel Geisler's speed was at the point recited in the statute, section 48–504, I. C. A., is not related by the witness, except by possible inference. In view of the indefinite nature of the witness' testimony it cannot be logically said that there is positive and uncontradicted evidence that Marcel Geisler did not exercise reasonable care or that he violated the provisions of

section 48-504, I. C. A. This court in *Geist v. Moore*, 58 Ida. 149, 70 Pac. (2d) 403, clarified and announced the rule as to when it is proper to instruct the jury as to the presumption, as follows:

"and in the following cases this court had definitely committed itself to the doctrine that where there is a conflict between the presumption and contrary evidence, from which reasonable minds might draw different conclusions, it is proper to instruct the jury as to the presumption." (*Packard v. O'Neil*, 45 Ida. 427, 262 Pac. 881, 56 A. L. R. 317; *Adams v. Bunker Hill etc. Min. Co.*, 12 Ida. 637, 89 Pac. 624, 11 L. R. A., N. S., 844; *Fleenor v. Oregon Short Line R. R. Co.*, 16 Ida. 781, 102 Pac. 897; *Staab v. Rocky Mountain Bell Tel. Co.*, 23 Ida. 314, 129 Pac. 1078; *Chiara v. Stewart Min. Co.*, 24 Ida. 473, 135 Pac. 245; *Graves v. Northern Pac. Ry. Co.*, 30 Ida. 542, 166 Pac. 571; *Webb v. Gem State Oil Co.*, 56 Ida. 465, 55 Pac. (2d) 1302; *Worth v. Worth*, 48 Wyo. 441, 49 Pac. (2d) 649, 103 A. L. R. 107.) Herein there is at most a conflict between the presumption and contrary evidence, from which reasonable minds might draw different conclusions, and it was proper to instruct the jury as to the presumption.

Appellants urge that the court erred in refusing and denying their motions for nonsuit, directed verdict, and in entering judgment in favor of respondents for the alleged reason that the evidence establishes without dispute that Marcel Geisler was guilty of contributory negligence as a matter of law. The evidence with relation to the speed at which Marcel Geisler was traveling has been sufficiently referred to above. Appellants further contend he was guilty of contributory negligence as a matter of law in failing to look and observe the approaching engine.

Upon a motion for nonsuit or directed verdict the evidence must be construed in the light most favorable to the plaintiff. (*Allan v. Oregon Short Line R. Co.*, 60 Ida. 267, 90 Pac. (2d) 707; *Branson v. Northern Pac. Ry. Co.*, 55 Ida. 220, 41 Pac. (2d) 629.) The rule is stated in *Claris v. Oregon Short Line R. R. Co.*, 54 Ida. 568, 33 Pac. (2d) 348, as follows:

"The rule, we think, is that in a motion for nonsuit or directed verdict the evidence must be construed in the light most favorable to plaintiff . . . . Where the question depends on a state of facts from which different minds may honestly draw different conclusions on that issue the question must be submitted to the jury for determination. Where the facts are disputed or inferences therefrom are reasonably disputable, the question is one for the jury."

There is considerable evidence that no warning signal was given of the approach of the engine to the crossing. Numerous witnesses testified that no whistle was blown and no bell rung and that they heard no whistle or bell and could have and would have heard such signals had they been given; that there was no flagman at the crossing and no one riding upon the foot board as the engine backed toward and across the railroad street crossing. There is no evidence that any signals were given. Section 60-412, I. C. A., requires that a locomotive bell be rung at a distance of at least 80 rods from the place where a railroad crosses a street, road or highway, and be kept ringing until it has crossed, or that the whistle must be sounded at a like distance, except in cities, and be kept sounding at intervals until the street, highway or road is crossed. This court has determined that failure to conform to the statutory duty prescribed by the statute, that is a failure to give the statutory warning signal of the approach of the train to the crossing constitutes negligence *per se.* (*Allan v. Oregon Short Line R. Co., supra; Whiffin v. Union Pac. R. Co.,* 60 Ida. 141 at 156, 89 Pac. (2d) 540; *Judd v. Oregon Short Line R. R. Co.,* 55 Ida. 461, 44 Pac. (2d) 291; *Wheeler v. Oregon R. R. etc. Co.,* 16 Ida. 375, 102 Pac. 347.) In *Allan v. Oregon Short Line R. Co., supra,* on rehearing, 60 Ida. at 280, the case of *Wheeler v. Oregon R. R. etc. Co., supra,* is quoted from and referred to as follows:

" 'It is true, however, that the authorities on this question are not uniform, but we believe that the better reason is with the proposition that the failure of the railroad company to comply with the statute is negligence *per se,* negligence in law. Under this statute the plaintiff makes his case by showing the negligence or noncompliance with the law, and the injury; but this statute does not, however, deny the right to

the defendant to show that the plaintiff is not entitled to recover because of contributory negligence on the part of the plaintiff which was the proximate cause or one of the proximate causes of the injury. This rule recognizes the right of a defendant charged with negligence to defend upon the ground of nonliability by reason of contributory negligence on the part of the plaintiff.'

''That decision was rendered thirty years ago and has been followed in Idaho since it was written. The legislature has not seen fit to change the rule therein expressed, nor do we.''

There was ample substantial evidence to support the conclusion of the jury that defendants were guilty of negligence which was a proximate cause of the injury in failing to give the statutory warning signal which reduces the question herein to that of whether or not contributory negligence on the part of Marcel Geisler was established as a matter of law or whether the evidence upon such issue was of such a character that different minds might honestly draw different conclusions which question must have been submitted to the jury for determination. There is no testimony as to what Marcel Geisler did or did not do before the accident with respect to due care. There is no evidence either that he looked or that he did not look. Appellants' argument is in effect that it is conclusively established that Marcel Geisler had an unobstructed view of the engine from any point on the highway extending from the crossing to a point at least 100 feet back, that is that it was established conclusively that Marcel Geisler could have seen the engine at any time while he traveled at least the last 100 feet to the crossing had he looked, which fact overcomes any presumption that he exercised due care and established as a matter of law that he was guilty of contributory negligence which caused or contributed to his injury. The evidence relied upon is that of Ples B. Wilson, city engineer, of Twin Falls, called as a witness on behalf of respondents who made a survey of the territory surrounding the spur track or sidetrack where it crosses the intersection. The witness was then asked concerning obstructions between certain definite points, two of them, the questions and answers being as follows:

"Q. I'm asking you as a surveyor to take this map you have made and measure from those distances—*from one point to the other*—and tell me what, if anything, there is to obstruct the view *between a point* 200 feet to the east of the railroad tracks and the center of the truck lane and *a point* 120 feet northwest of the north line of the truck lane and the center of the railroad tracks."

It should be noted that the question seeks information as to whether the view is obstructed between two definitely located points on the railroad and on the truck lane. It should also be noted that the measurements were requested from the center of the truck lane and the center of the railroad track while the evidence discloses that Marcel Geisler was traveling on his right hand side of the highway considerably closer to appellant's engine than the center of the highway, and the distance Marcel Geisler would travel before reaching the railroad tracks was measured to the center of the tracks. To this question the witness stated that a telephone pole and a railroad crossing signal were the only things which might obstruct the view between such points. He was then asked the questions and answered as follows:

"Q. Now I'll ask you another question: Take the same assumptions, and for one point in the center of the north side of the truck lane 100 feet east of the intersection with the railroad track and then at that intersection measure 100 feet down the railroad track—the same track—and tell me whether there is anything to intercept the view or obstruct it.

" . . . .

"Q. And there is nothing between, is there, to obstruct the view?

" . . . .

"A. I don't believe there would be, *at those two points.*

" . . . .

"Q. And the only things you know of within that vicinity that we have spoken of, *at a point south of the billboard,* is a light pole of 12 or 15 inches diameter and the posts supporting a railroad crossing sign approximately 8 by 8?

"A. I believe that's all that is in that vicinity *right there between those points on the map.*"

A most careful examination of these questions and answers and all the testimony with reference to obstructions discloses that the only fact which may be said to have been conclusively established by the evidence is that between a point 100 feet east of the intersection with the railroad track and a point 100 feet down the track there was nothing to intercept the view. The record does not conclusively, nor by inference do we believe, establish that the view was unobstructed at other sighting points or any sighting points except those specifically testified to. Assuming that Marcel Geisler could have seen the engine at a point 100 feet down the track from a point 100 feet from the intersection, the record does not disclose that the engine was at such point when Geisler could have looked, nor that he could have seen the engine either at a lesser or greater distance from the highway-railroad intersection. Furthermore there is evidence which appears to present a conflict as to the question of an obstruction to the view. The testimony of W. Gates was to the effect that he was traveling approximately 100 feet behind Marcel Geisler. He further testified:

"I kept listening for trains, and all at once I seen this switch engine bust out there, and then the crash."

"Q. Where did you first observe the engine?

"A. Well, I imagine he was just right *at the edge of the paving; there's a sign board had my view obstructed.*"

"Q. Can you tell us at what speed the engine was traveling when you first observed it?

"A. . . . . I couldn't say exactly what speed, but I would say she was coming out faster than I was traveling."

██ From the foregoing testimony the conclusion might be drawn not only that the engine was traveling rapidly, in excess of 15 to 18 miles an hour, the speed at which Gates states he was traveling, but that likewise approximately 100 feet from the railroad track a view of the engine was so obstructed that it could not be observed until the engine "busted out" right at the edge of the paving. Such evidence at least presents some conflict as to the question of obstructed or unobstructed view. The jury was permitted to view the premises and it was entitled to consider the view of the premises in determining the weight and applicability of the evidence

introduced at the trial. (*Tyson Creek R. R. Co. v. Empire Mill Co.*, 31 Ida. 580, 174 Pac. 1004.)

An examination of the cases involving railroad-highway crossing accidents discloses that the courts have taken into consideration all the circumstances, including the failure to exercise due care on the part of the railroad company, in connection with the issue of due care by the driver of the automobile. In *Whiffen v. Union Pac. R. Co., supra,* as "pertinent composites" the following are set forth:

"The traveler however has the right to assume that the railroad company will give the required signals of the train's approach and that it will be running and operating its trains at such places at the usual and ordinary rates of speed."

"The railroad company must make the approach of its trains at crossings known by appropriate means so that the traveler by looking and listening and stopping so to do when required by statute or otherwise necessary, before crossing the tracks may be able to discover, while in a place of safety, the approach of trains."

In *Pokora v. Wabash R. Co.*, 292 U. S. 98, 54 Sup. Ct. 580, 78 L. ed. 1149, 91 A. L. R. 1049, Justice Cordozo, stated the principle as follows:

"Indeed, the statutory signals did not exhaust the defendants' duty when to its knowledge there was special danger to the traveler through obstructions on the roadbed narrowing the field of vision. (Cases.) All this the plaintiff, like any other reasonable traveler, might take fairly into account. All this must be taken into account by us in comparing what he did with the conduct reasonably to be expected of reasonable men."

The evidence herein with reference to the circumstances discloses that no warning signal by whistle or bell was given, that there was no flagman at the intersection, that the locomotive was being operated by the fireman rather than by the engineer, that the fireman operating the locomotive was not looking toward the crossing but toward some oil tanks to the side that the engine was traveling rapidly and "busted out" upon the intersection, that it was backing up, and that the intersection was the intersection of U. S. Highway No.

30, as it went through Twin Falls, and an infrequently used switch or spur track of appellant railroad.

In *Hendrickson v. Great Northern R. Co.*, 49 Minn. 245, 51 N. W. 1044, 32 Am. St. 540, 16 L. R. A. 261, the court said:

"Assuming then, as we must, for the jury might have so determined, that no cautionary or warning signals were given, it must be held that if, by reason of this omission or neglect on the part of the defendant's servants, Mr. Hendrickson was led to be less vigilant when drawing near to the railway, his view along the tracks being obscured until he reached a place or situation in which his life was jeopardized and finally lost, his want of vigilance cannot be pronounced culpable or concurring negligence, *as a matter of law.* It is not an absolute answer to the claim for redress made by his legal representative that, notwithstanding the alleged omission of cautionary signals by the persons in charge of the locomotive he might, by the exercise of greater vigilance, have discovered the approaching train, if he had foreseen a violation of the statute instead of relying, perhaps, on its observance; *Ernst v. Hudson River R. R. Co.*, 35 N. Y. 9, 90 Am. Dec. 761.''

In *Wing v. Western P. R. Co.*, 41 Cal. App. 251, 182 Pac. 969, the circumstance that the accident occurred at a spur track was taken into consideration the court saying:

"If plaintiff had been injured by a train or car running on either of the main tracks of the defendant's railroad we should have no hesitancy in agreeing with the views of the learned judge of the trial court as expressed in his order granting the motion for nonsuit. The condition of the spur track, as disclosed by the evidence above referred to presents a very different question.''

See, also, *Rosenbloom v. Southern P. Co.*, 59 Cal. App. 102, 210 Pac. 53.

In *Newton v. Oregon Short Line R. Co.*, 43 Utah, 219, 134 Pac. 567, the court considered the circumstances that the engine which struck and killed a boy on a bicycle and stated:

"The fact in this case that the engine and tender were running backwards may have had a tendency to confuse if not mislead the deceased much more than might have been the case if the engine had been run in the natural way. In looking up the track as the deceased saw the Saltair train

approaching on the north track, he may likewise have noticed the rear end of the tender of the engine on the south track, but may not have noticed that it was moving towards him."

The question of contributory negligence is for the jury, and never one of law, unless the facts alleged in the complaint or proven are reasonably susceptible of no other interpretation than that the conduct of the injured party caused, or contributed to, his injury, and that, because of his negligence and carelessness, he did not act as a reasonably prudent person would have acted under like circumstances. (*Adkins v. Zalasky*, 59 Ida. 292, 81 Pac. (2d) 1090; *Allan v. Oregon Short Line R. Co.*, 60 Ida. 267, 90 Pac. (2d) 707; *Smith v. Oregon Short Line R. R. Co.*, 32 Ida. 695, 187 Pac. 539; *Fleenor v. Oregon Short Line R. R. Co.*, 16 Ida. 781, 102 Pac. 897.)

"All that can be said is that unless the question of negligence is free from doubt, the court cannot pass upon it as a question of law; that is, if after considering all the evidence and the inferences that may be deduced therefrom the court is in doubt whether reasonable men, in viewing and considering all the evidence, might arrive at different conclusions, then this very doubt determines the question to be one of fact for the jury and not one of law for the court. The court can pass upon the question of negligence only in clear cases. All others should be submitted to the jury. The reason of this is apparent from the fact that in this state all questions of fact are for the jury; and therefore, unless it is clear that in viewing and considering the evidence reasonable minds might not arrive at different conclusions, the case should go to the jury." (*Newton v. Oregon Short Line R. Co., supra.*)

The question of whether or not Marcel Geisler acted as an ordinarily prudent man would act under like circumstances, or was guilty of contributory negligence, in this case, was a question of fact for the jury to determine, and not one of law for the court. (*Kirby v. Southern Pac. Co.*, 108 Or. 290, 216 Pac. 735.)

Finally appellants urge respondents were not entitled to recover against appellants because Marcel Geisler

was a minor member of the employer's family, dwelling in his house, and that the employer had not prior to the accident filed with the Industrial Accident Board an election in writing that the provisions of the Workmen's Compensation Law should apply to Marcel Geisler. In other words appellants contend that respondents failed to prove that Marcel Geisler was insured by the State Insurance Fund.

Exhibit A attached to respondents' amended complaint, admitted in evidence as Respondents' Exhibit "F" is a "compensation agreement" signed by the claimant Marcel Geisler, the employer, Geisler Beverage Company by F. H. Geisler, The Industrial Accident Board, by its three members, and the State Insurance Fund by its manager. By this agreement the State Insurance Fund accepted liability on Marcel Geisler's claim for injuries and he was awarded compensation. It also appears that the manager of the State Insurance Fund testified that Marcel Geisler filed Notice of Injury and Claim for Compensation with the Industrial Accident Board (such notice and claim being admitted in evidence), and that the State Insurance Fund accepted liability on November 5, 1937, that it had become obligated to pay Marcel Geisler compensation, and that it had made payments thereon. That such an agreement for compensation constitutes a decision and award of the board and has the same effect as an award by the board was determined by this court in *Reagan v. Baxter Foundry etc. Wks.*, 53 Ida. 722, 27 Pac. (2d) 62, wherein the court said:

"The record discloses that the employer, the State Insurance Fund and the employee reached an agreement in regard to compensation, which, when filed with the Industrial Accident Board, was approved by it. This agreement constituted the decision and award of the board and had the same effect as an award by the board. (I. C. A., sec. 43–1402; *Rodius v. Coeur d'Alene Mill Co.*, 46 Ida. 692, 271 Pac. 1.)"

Section 43–1004, I. C. A., under which the Department of Finance prosecuted this action provides:

"When an injury for which compensation is payable under this act shall have been sustained under circumstances creating in some other person than the employer a legal liability to pay damages in respect thereto, the injured employee may,

at his option, either claim compensation under this act or obtain damages from or proceed at law against such other person to recover damages; and *if compensation is claimed and awarded under this act an employer having paid the compensation or having become liable therefor shall be subrogated to the rights of the injured employee to recover against that person;* provided if the employer shall recover from such other person damages in excess of the compensation already paid or awarded to be paid under this act, then any such excess shall be paid to the injured employee less the employer's expenses and costs of action."

It would thus appear that the elements upon which subrogation is dependent have been established. Compensation was claimed and awarded and the State Insurance Fund has become liable therefor. Under the statute above quoted the liability or amount of liability of the tort-feasor is not dependent upon the amount of compensation awarded or the fact that compensation has been awarded the injured employee as is true in some jurisdictions and in which case the tort-feasor would be vitally interested. Neither recovery nor the amount of damages recoverable from appellants is controlled or fixed in any way by the amount of the award made by the board, but is based upon the damages sustained by reason of negligence of appellants. Appellants' liability being dependent upon the question of negligence, irrespective of the party plaintiff, and the ultimate fact that compensation had been awarded and the fund had become liable for its payment having been established all proceedings leading up to the award are immaterial in so far as appellants are concerned.

The judgment is affirmed. Costs awarded to respondents.

Ailshie, C. J., and Givens, Morgan and Holden, JJ., concur.

Petition for rehearing denied.