(No. 6975.   April 25, 1942)

RODNEY MADRON, Appellant, v. LEE McCOY and
CARSTENS PACKING COMPANY, a corporation,
Respondents.

(126 Pac. (2d) 566)

(Rehearing denied June 22, 1942)

Rayborn & Rayborn, for Appellant.

Elam & Burke, for Respondents.

AILSHIE, J.—Appellant, a resident of Twin Falls County, was engaged in the trucking business and owned and operated a 1939 "Mercury Model" Ford truck and semi-trailer, which will hereinafter be referred to as the *brick truck*. Richard T. White was employed by appellant as driver and was hauling brick. Respondent, Carstens Packing Company, a corporation, employed Lee McCoy, also a respondent, as driver for its, hereinafter designated, *stock truck*, used "to haul chopped hay and cattle." McCoy had no driver's license.

The brick truck was equipped with hydraulic brakes, signaling device and a rear view mirror; the semi-trailer was equipped with air brakes, controlled from the steering wheel of the truck. As for the stock truck, it was a 1928 Fageol, "had no rear view mirror and no mechanical arm for use in indicating intention to turn"; the body of the truck was so high and wide, that the driver "could not see what was following him from the rear and could not give any signal of intention to turn to the left."

About two o'clock p. m., November 5, 1940, McCoy was proceeding with the stock truck in a westerly direction on U. S. Highway 30, about two miles east of the Village

of Kimberly in Twin Falls County. Near this point there is a gravelled farm market road, running north and south, which intersects U. S. Highway 30; the latter is paved and runs east and west. The highway is "straight right there" and for considerable distance each way. Following the stock truck (but unknown to its driver, McCoy) was White, driving appellant's truck, with a trailer, loaded with "around fourteen ton" of brick. McCoy says he reached a point "about two telephone posts" (200 feet) back of the intersection of the two roads above mentioned and noticed another car (later identified as the Powers car) approaching from the opposite direction; that he slowed down, from a 25 to a 10-mile an hour speed, as he figured, if he kept on traveling at the 25-mile pace, he would reach the intersection at the same time as the other car. When the Powers car reached the intersection, it turned south on to the gravelled road.

Upon reaching the intersection, the stock truck, *without signal or warning of any kind from the driver (McCoy), turned slightly left and south toward the side road, intending to go south on the intersecting road.* White driver of the brick truck, not having notice of McCoy's intention to turn, and apparently endeavoring to avoid running into the stock truck, pulled to the left, avoided a rear end collision, and hit the side of the stock truck "about three feet from the rear end and scraped the full length along the side." The brick truck then crashed headon into a tree at the southwest corner of the intersection, killing White, demolishing the brick truck, and damaging the semi-trailer. This action was brought by the owner of the brick truck and trailer, for damages for the loss of the truck, for costs and disbursements expended. From a judgment for defendants, this appeal is prosecuted.

The case was tried to the court without a jury and the court found, *inter alia:*

## "V.

"That the act of defendant, Lee McCoy, in attempting to make a left turn into said intersecting highway at said intersection contributed to said accident.

## VI.

"That the overtaking and passing by plaintiff of defendant's truck in said intersection contributed to said accident.

## VII.

"That there is a presumption that the driver of plaintiff's truck and semi-trailer drove said truck and semi-trailer in a careful and prudent manner; that plaintiff proved that defendant, Lee McCoy, was making a left hand turn in said intersection without giving a signal and without any rear view mirror or mechanical device by a preponderance of the evidence; that the defendants proved that plaintiff's truck was overtaking and passing defendants' truck in said intersection by a preponderance of the evidence."

It is contended by appellant that there is no sufficient evidence to support the finding, that appellant's driver was guilty of contributory negligence in attempting to overtake and pass respondent's truck at the intersection.

During the inquest, Nov. 6, 1940, on the death of White, testimony was given by Mr. Powers, (the driver of the car traveling in an easterly direction on U. S. Highway 30) in part as follows:

"We had observed these vehicles approaching from the east. They were travelling westward, and of course we turned south. They were down the highway just a little distance. . . . . I was looking in the rear view mirror and I just remarked there was going to be a crash there. Then this car [stock truck] made a turn to the left. The car in front . . . . a stock truck, a big truck . . . . a very large truck. When I saw it make the turn to the left I just mentioned there was going to be a crash and just about that time we heard the crash. Of course it just happened there within the matter of just a few seconds. . . . . It was in my mind when I observed him make that turn there was going to be a crash, because that big a truck couldn't do anything but make that crash as I saw it.

Q. You refer to the *big truck?*
A. *The one on which the brick were being transported.*

. . . . Of course this big truck hit this other truck, just sideswiped it and knocked it over here into a cement culvert, the head of a culvert here and hit that and just ran into a large tree. That is, the *larger truck*, just hit that as squarely as anyone could possibly drive it. His position bears out that statement. That, of course, is where it naturally stopped. . . . .

Q. In referring to the *big truck,* you refer to the truck which was following?

A. The *one loaded with brick*, yes.

Q. You stated that as you turned this corner this truck in the lead was still moving. It hadn't, that truck hadn't stopped in order to let you turn south?

A. No. He was still coming toward us. We made our turn. There wasn't anything there that would interfere with our turning." (Italics supplied.)

As to the speed of the two trucks, Powers said:

"They were both traveling, I didn't make any guess— if they had been going—they weren't traveling fast, neither truck, of course. . . . . Nothing out of the ordinary."

Roy Fuller, superintendent of the county farm and a deputy sheriff, testified: that the accident occurred "pracitcally on the yellow line [of the highway]; maybe a little south . . . . almost center of the intersection there."

"Q. According to the observation which you made there would you say the brick truck was passing the Carsten truck there at the place where the impact occurred?

A. Yes, I'd say it was.

Q. That the Madron truck was passing the other truck in the intersection?

A. Yes. . . . .

Q. I just want to ask you one more question on cross examination; did you examine the road out there when you arrived to see if there were any brake marks to the east of where the collision occurred?

A. Yes.

Q. And did you find any?

A. No."

Testimony, on behalf of respondents, was given by McCoy, driver of the stock truck, as follows:

"And where were you going at the time of this accident?

A. Out south of Kimberly.

Q. On what highway were you traveling?

A. U. S. 30.

Q. You say you intended to go south of Kimberly?

A. Yes.

Q. Were you making a turn at the time of the accident?

A. Yes sir.

Q. If so, on to what highway?

A. Onto a gravel road.

Q. The one at the place of the accident?

A. Yes.

\*    \*    \*    \*    \*    \*    \*    \*    \*

Q. About what speed were you traveling, Lee, as you came along U. S. Highway 30?

A. About twenty-five miles an hour.

Q. And did you observe any other cars as you came along just before the time of the accident, shortly before?

A. Yes.

Q. As you approached the intersection there where the accident occurred did you observe another car going in an opposite direction?

A. Yes.

Q. And did you later find out whose car that was?

A. Yes.

Q. Whose was it?

A. Mr. Powers'.

Q. And his car turned south on that same road that you intended to take, did it?

A. Yes.

Q. Now when you saw that car of Powers coming the opposite direction from which you were going what did you do, if anything?

A. Started slowing down.

Q. About how far back from the intersection would you say you were when you started to slow down?

A. Oh about two telephone posts.

Q. Two telephone posts back from the intersection?

A. Yes.

Q. And state in what manner you slowed down?

A. Gradually.

Q. And what did you next do then; just state to the court what was done?

A. Gradually made the turn when I got to the intersection.

Q. Then what happened next?

A. Well I got just a little ways across the yellow line and this other truck hit the back end of my truck.

Q. Now what part of your truck was struck by the other truck?

A. Left side and about three feet from the back end.

Q. You say three feet from the back end; what do you mean; along what part of the truck do you mean?

A. On the side, left side.

Q. Three feet forward from the back end on the left hand side?

A. Yes. . . . .

Q. Did you observe whether or not there was any damage or any marks on the front bumper of the Carsten truck?

A. No, there was not.

Q. You did examine to see?

A. Yes.

Q. And was there any mark there?

A. No. . . . .

Q. State whether or not you were in the intersection at the time when the brick truck struck the side of the Carsten truck?

A. I was.

Q. And did you, at any time there, immediately preceding the accident or at the time of the accident hear any horn whatsoever?

A. No.

Q. Now aside from the Powers car which was going in an opposite direction did you observe any other car there on the highway?

A. No.

Q. U. S. Highway 30 on which you were traveling; is that a straight road through there or does it have a curve?

A. It's straight right there.

Q. And it is straight at least a quarter of a mile each way from the place of the accident?

A. Yes.

Q. Are there any grades there, any perceptible grades?

A. No.

Q. Did you examine the road afterwards there to determine whether or not there were any brake marks on the highway?

A. I didn't see any.

Q. I said did you examine to see?

A. Yes.

Q. And did you find any?

A. No.

Q. Mr. McCoy, I believe you said, I understood you to say you saw the Powers car coming from the west going east, didn't you?

A. Yes.

Q. How far was it from you at the time it made the turn south?

A. Oh about one-hundred feet.

Q. It was about one-hundred feet?

A. Yes.

Q. Then you was within about one-hundred feet of the crossing when the Powers car made the turn?

A. Yes.

\*    \*    \*    \*    \*    \*    \*    \*    \*

Q. Now, did I understand you to tell Mr. Elam that you slowed down because of Powers car?

A. Yes.

Q. If you were that far back when the Powers car made the turn why did you slow down?

A. I'd have been there at the same time as he was if I kept going.

Q. You started to slow down about how far back?

A. About two telephone posts.

Q. Do you know how far apart those two telephone posts are?

A. No, I don't.

Q. Can you give us some idea?

A. About one-hundred feet.

Q. So you started to slow down something like two-hundred feet before the intersection?

A. Yes.

Q. How fast was you traveling before you started to slow down?

A. About twenty-five miles an hour.

Q. You were traveling twenty-five miles before you slowed down, and how much had you slowed down when you got to the intersection?

A. About ten miles an hour.

Q. During the time when you started to slow down, which you say was two telephone posts back or about two-hundred feet, and the time you reached the intersection and made your turn to the left, did you give any signal that you were going to stop or turn?

A. No.

Q. Did you have any way of giving signals?

A. No.

Q. You would have had to step out on the running board and hold your hand out to give a signal?

A. Yes.

Q. Could you see behind you?

A. No.

Q. The body of your truck was large enough you couldn't see a car coming behind you?"

A. No.

Q. If a truck had pulled up behind you when you were one pole back or two posts back you would not have known it; is that correct?

A. Yes. . . . .

Q. Could you tell the court about the distance of your truck body; could you estimate about how long that truck body is?

A. Oh about twelve feet.

Q. About twelve feet?

A. Yes sir.

Q. Now then after that explanation by the court—

I mean your explanation as to where it struck you, will you explain to the court why the damage was done to your truck in front?

A. Because it hit that there two by four on the outside and tore it off.

Q. You hit that?

A. He did with the truck.

Q. Well would you explain to the court how he got from back here up here to hit that two by four?

A. Side-swiped.

Q. He first hit your back end—back in here, and then hit you up here?

A. Yes.

Q. Wouldn't you say it's obvious from this picture that you had been struck right here? (Indicating on Exhibit 6.)

A. No.

Q. Now, was the front left fender of that truck damaged; your truck?

A. Slightly. . . . .

Q. Do you know what part of the truck struck your truck?

A. No, I don't.

Q. How long had you been employed by the Carsten Packing Company?

A. About a week.

Q. You had been employed about a week; had you been driving a truck before?

A. Yes.

Q. For them?

A. Just that week.

Q. Did you have a chauffeur's license?

A. No, I didn't have no daily run.

Q. Beg pardon?

A. I didn't drive a truck all the time.

Q. That's the reason you didn't have a license?

A. Yes.

Q. Had you had much experience on the highway with a truck?

A. Yes.

Q. What had you gone after that day; what kind of a load were you hauling?

A. Took cattle up to Hansen and was going south of Kimberly to get some chopped hay.

Q. Was there anyone with you?

A. No.

Q. No one with you?

A. No."

Appellant (owner of the brick truck) talked with McCoy, in the presence of appellant's counsel, when the following took place:

"Q. Will you tell the Court just what that conversation was as you recall it? A. Well, we asked him [McCoy] if he gave any signal and he said 'No.' And we asked him if he had any signal device and he said 'No,' and a rear view mirror, and he said 'No.' And we asked if he tried to give any signals with his arms and he said: 'No.' Then you just asked: 'In other words you just turned,' and he said 'Yes.' "

According to McCoy, driver of the cattle truck, he slowed down from a speed of 25 to 10 miles per hour in the space of 200 feet, immediately preceding reaching the intersection, without giving any signal, or notice of intention, to turn either to the right or the left.

It would seem that this conduct, on the part of the driver of the cattle truck, was tantamount to saying to the driver of any following truck, that he was slowing up to allow the latter to pass—at least until he reached the line of intersection. It would have been otherwise had he, at any time, given signal of intention to turn either to the right or the left. The very fact of reducing his speed, to two-fifth of his previous speed, in the space of 200 feet, without giving any sign or signal, would indicate to the average driver following him, that the one so reducing his speed was intending to allow the following car to pass. The law required him to see and know, when he started to turn, that a car was following him; and what the law requires him to know, it will assume that he did know.

In *Litherbury v. Kimmet,* 183 Cal. 24, 195 Pac. 660, the court said:

"The necessity for the driver of a motor vehicle to signal before turning, and particularly before turning to the

left, is so great, and the practice of signaling in such a case is so universal and so relied upon, that there is no room for a reasonable difference of opinion as to the conduct of a driver who fails to signal without making certain that there is no one behind him. He is guilty of negligence, and the court is justified in so charging the jury."

2 Blashfield, Cyc. Auto. Law and Practice, sec. 1124, p. 288, says:

" . . . . entirely aside from statute, the need for warning from a motor vehicle turning to the left, of such intention, particularly to any vehicle close behind, is so great, and the practice one so generally used and relied upon, that a driver turning in that direction, who fails to signal without making certain that there is no one behind him, is to be deemed negligent as to any vehicle in the rear with which he may come into collision in making his turning movement. . . . . "

It is evident that the cars actually collided near the approach to, or before entering, the intersection, since they were both moving forward; the forward one at a speed of ten miles, and the other at twenty-five miles per hour. Otherwise, the car to the left would not have "scraped" the left side of the front *trailer and the truck to the forward end,* and then have landed up against a tree *at the southwest corner of the intersection.* Had the contact not have occurred until both trucks were *within* the intersection (of a rural road), without the application of brakes to either truck, they would both have driven across the intersection before the passing truck could have "scraped" the *full length* of the stock trailer.

In view of the fact, that the brick truck first came in contact with the stock truck three feet forward from the rear left corner of the stock trailer, and that it sideswiped the trailer *full length to the front of the truck, without serious damage to the latter,* makes it quite clear that the stock truck was only *slightly* to the south of the center ( yellow) line on its southerly turn; (the witness says, "practically on the yellow line . . . . maybe a little south . . . . almost center of the intersection"), so that its *actual movement* indicating intention to turn had evi-

dently been only momentary and not of sufficient duration of time to enable the driver of the passing car to either stop or slow down.

So long as the two drivers were proceeding in the same direction along the same highway, the driver of the front truck was under no duty to observe or take notice of the driver of the rear truck; and it was the duty of the driver of the rear truck to observe the front truck and avoid any collision with it. While they were both proceeding in this manner, and no signal or warning was given by the driver of the front truck, of any intention to change his course or speed, it was the duty of the rear driver to regulate his own speed so as to avoid an accident.

On the other hand, as soon as the driver of the front truck determined to change his course or to "suddenly decrease" his speed, it became his duty to make known his purpose by appropriate signal, as prescribed by the statute. (Sec. 48-517, I. C. A., as amended by 1939 S. L., chap. 108, p. 182.) The failure to give such signal not only constituted negligence but was a misdemeanor under our statute. (Sec. 48-557, I. C. A.)

The question of negligence, as between the drivers of trucks, one following the other and having a collision with each other at an intersection, differs from that of a collision between vehicles moving at angles to each other at an intersection. In the one case, the moving vehicle ahead is visible and the driver of the following car must be governed in his movements by the signals given by the preceding car; whereas, two cars, meeting from triangular directions at an intersection, must be governed by the rule, that one who approaches first has the right of way, except as that rule is modified by stop signs or other signals at trunk or main line highways. Here the only one complaining of appellant's negligence is the one who invited the act now complained of by slowing down and giving no signal of intention to turn, impliedly saying: "Pass on." (Sec. 48-514, I. C. A.)

What might have been negligence as between appellant's driver and one, either approaching from the oppoeite direction or from the cross road, is not available to respondent as a defense, unless the same negligent act

was the contributory cause of the accident. The negligence of the driver of the stock truck is abundantly established; indeed, it is admitted. That negligence was continuous from its inception to and including the moment of the injury. It inhered in the action and conduct of the driver. It was the proximate cause of the injury. After slowing down, without signal, impliedly telling White to *drive on,* McCoy turned his truck southward, starting a left turn, thus causing the collision and injury.

It is contended by respondent, that appellant's driver was the contributing cause of the accident by *overtaking and attempting to pass* the stock truck at the intersection of two highways in violation of sec. 48-513, I. C. A., which provides that a following motor car shall not "overtake and pass any other vehicle proceeding in the same direction . . . . *at any intersection* of highway unless permitted so to do by a traffic or police officer."

The usual terms of such statutes or ordinances are that it shall not "pass," but ours says, "overtake and pass." The statute permits the operation of combination truck and trailer of an overall length of not exceeding 65 feet (sec. 48-535, amended, 1939 S. L., chap. 103, p. 172) ; so it is at once apparent that a truck and trailer of over the length of the intersection (usually less than 30 feet in rural districts) could not "overtake and pass" a similar truck and trailer within such an intersection; nor could it "pass" such a conveyance *within the intersection,* even though it had "overtaken" it prior to reaching the intersection. It would be utterly impossible for a 65-foot truck to "overtake *and pass*" another truck of equal length moving in the same direction within the space of an ordinary 30-foot surfaced highway intersection. Here, the most that can be said, mathematically true, is that, having *overtaken* the stock truck on arrival at the intersection, the brick truck was attempting to *"pass"* within the intersection and a collision resulted through the negligence of the stock truck driver's failure to give notice of his intention to make a left turn.

In this state, contributory negligence is matter of defense and must be pled. The burden of proof rests on the party who sets up such defense. (Sec. 5-816, I. C.

A., and notes.) Here the driver, charged with contributory negligence, is dead; and the law raises "the presumption .... that the one who was killed .... was exercising reasonable care and precaution for the protection and preservation of his person and life." (*Chiara v. Stewart Mining Co.*, 24 Idaho 473, 478, 135 Pac. 245; *Fleenor v. Oregon Short L. R. R. Co.*, 16 Ida. 781, 102 Pac. 897; *Adams v. Bunker Hill, etc., Min. Co.*, 12 Ida. 643, 89 Pac. 624, 11 L. R. A., N. S., 844.)

Bearing in mind this rule and the fact, that the burden of proof was on defendant, we are unable to find in the record either direct or circumstantial evidence sufficient to establish contributory negligence, either in fact or law, on the part of the driver of the alleged overtaking truck.

For authorities very similar in point of fact to the case at bar, see: *Williams v. Herrin Transfer & Warehouse Co.*, (La. App.) 153 So. 313, and *Wesley v. English*, (5th Cir. Ct. App.) 71 Fed. 2d 392.

We are forced to the conclusion, that the charge of contributory negligence, on the part of appellant's driver, is not sustained by substantial evidence in the record before us.

The judgment is reversed and the cause is remanded for further proceedings in accordance with the views herein expressed. Costs to appellant.

Budge and Holden, JJ., concur.

GIVENS, C.J., dissenting—The statement, "White, driver of the brick truck, not having notice of McCoy's intention to turn, and apparently endeavoring to avoid running into the stock truck, pulled to the left, avoided a rear end collision, and hit the side of the stock truck 'about three feet from the rear end and scraped the full length along the side,'" if meant as a statement that White was not intending to pass, as distinguished from avoiding a rear end collision, is contrary to the statement of the plaintiff's own witness Fuller:

"Q. According to the observation which you made there would you say the brick truck was passing the

Carsten truck there at the place where the impact occurred? * * *

A. Yes, I'd say it was.

Q. That the Madron truck was passing the other truck in the intersection?

A. Yes."

I cannot agree that this statement: "It would seem that this conduct [gradually slowing up in 200 feet from 25 to 10 miles an hour], on the part of the driver of the cattle truck, was tantamount to saying to the driver of any following truck, that he was slowing up to allow the latter to pass—at least until he reached the line of intersection. It would have been otherwise had he, at any time, given signal of intention to turn either to the right or the left. The very fact of reducing his speed, to two-fifths of his previous speed, in the space of 200 feet, without giving any sign or signal would indicate to the average driver following him, that the one so reducing his speed was intending to allow the following car to pass," is either a proper, exclusive assumption of fact or exculpatory statement of law.

I cannot agree with the holding in the opinion that only vehicles sufficiently short and traveling at such rate of speed that they may entirely pass and clear each other at intersections are interdicted by subdivision "c" of section 48-513. I think that section of the statute prohibits any vehicle, no matter how long or short, at any rate of speed, to pass another at an intersection unless permitted by traffic or police officer. The larger the vehicles the greater the hazard to traffic at such intersections because the greater would be the obstruction of the view of everybody concerned.

It seems to me the construction placed upon the presumption of due care and caution as supporting the proposition that there was no evidence of contributory negligence presenting a jury question is directly contrary to the holding in *Department of Finance v. Union Pacific Railroad Co.*, 61 Ida. 484, 104 Pac. (2d) 1110. The trial judge, sitting without a jury, was performing the functions of a jury; and it was for him to determine from all facts and circumstances, giving full force and effect to

the undoubted holding that the defendant was guilty of several acts of negligence, whether the acts of the deceased constituted, under subdivision 3 of 48-504, 48-512, 48-513 (c), and 48-515, such contributory negligence as to bar recovery. Neither *Williams v. Herrin Transfer & Warehouse Co.*, (La.) 153 So. 313 nor *Wesley v. English* 71 Fed. (2d) 392, reversed a verdict for defendant, or its equivalent, because contributory negligence was not shown as a matter of law but affirmed verdicts which had resolved conflicts of facts against the defense of contributory negligence.

I therefore dissent.

Morgan, J., joins in this dissent.